

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-17-00183-CR

MIRANDA RENEA KELSO, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 40th District Court
Ellis County, Texas
Trial Court No. 41161CR

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Moseley

OPINION

After viewing videos obtained from Miranda Renea Kelso's cell phone, which depicted sexual acts committed by Kelso with three-year-old Hansel,[1] an Ellis County jury found her guilty of indecency with a child by contact.[2] Kelso was sentenced to three years' imprisonment and was ordered to pay $413.00 in court costs.[3] At trial, Kelso argued that the video recordings should have been suppressed because the contents of her cell phone were illegally accessed by her husband, in violation of Article 38.23 of the Texas Code of Criminal Procedure. On appeal, Kelso argues that the trial court erroneously (1) rejected her request to include an Article 38.23 instruction in the jury charge, (2) rejected her requested jury instruction on the defenses of duress and necessity, (3) denied her a suppression hearing, (4) denied her motion to suppress the video recordings, (5) admitted communications she had with her husband over her objections of spousal privilege and relevance, and (6) excluded evidence demonstrating that her husband had a bias and motive to testify against her.[4]

We conclude that there was no jury charge error and that the trial court did not abuse its discretion in denying Kelso's motion for a suppression hearing in the middle of trial. We further

---

[1]We use a pseudonym to protect the identity of the child. *See* TEX. R. APP. P. 9.10.

[2]Originally appealed to the Tenth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013). We follow the precedent of the Tenth Court of Appeals in deciding this case. *See* TEX. R. APP. P. 41.3.

[3]In companion cause number 06-17-00184-CR, Kelso also appeals from a conviction for indecency with a child by exposure.

[4]Kelso also argues that the trial court erroneously assessed $413.00 in court costs in both this case and in companion cause number 06-17-00184-CR, which were tried together. Because this issue only affects the companion case, we address this issue in detail in our opinion in cause number 06-17-00184-CR.

find that the trial court properly denied Kelso's suppression motion and did not abuse its discretion in making the evidentiary rulings which were preserved for our review. Accordingly, we affirm the trial court's judgment.

## I.    The Evidence at Trial

Kelso decided to leave her husband, Michael Hanington, while pregnant with his second child. She took Hansel and his half-brother with her. Hanington testified that when Kelso left their apartment on August 28, 2015, the front door was ajar, clothing and toys had been taken, and Kelso had reported to family that she was ending the marriage. In an effort to expose any infidelity, Hanington testified that he went through a cell phone that Kelso had left on a table in plain sight. Two months after Kelso disappeared, Hanington located another cell phone in a closet, guessed Kelso's password to obtain its contents, and uncovered video recordings depicting Kelso engaging in sexual acts with Hansel. Over objection, Hanington testified, "I found some videos of her masturbating in front of and around and letting [the] child touch her." Hanington said that he called Child Protection Services (CPS) to report the abuse so he could obtain an advantage in divorce proceedings, which were still pending at trial.

Talitha Cochrane, a CPS investigator, received Hanington's report, found Kelso living in a domestic violence shelter with the children, and confronted her about the allegations of sexual abuse with Hansel. According to Cochrane, Kelso admitted to sexually abusing Hansel multiple times and described the acts in detail. However, Kelso told Cochrane that she had only engaged in the acts at Hanington's request and was afraid to refuse him.

3

According to Cochrane, Kelso and Hanington engaged in a "[b]ondage, discipline, dominance, submission, [and] sadomasochism" (BDSM) lifestyle, in which Hanington would dominate Kelso through violent acts during sex. While Kelso was initially a willing participant in BDSM, Cochrane testified that Kelso halted consent to Hanington's increasingly violent acts of physical abuse and rape. According to Cochrane, Kelso left Hanington to escape the abuse. After speaking with Kelso, Cochrane classified Hanington as a perpetrator.

Elizabeth Glidewell, a detective with the Waxahachie Police Department, conducted an audio/video-recorded interview of Kelso at the shelter. In the interview, which was admitted into evidence without objection, Kelso confessed that she had engaged in sexual acts with Hansel, but only because Hanington was interested in incest and directed the acts. Kelso said she was scared to refuse her husband because he abused her physically and sexually. Kelso told Hanington that she would try incest because she was tired of fighting him. Kelso's interview and Cochrane's testimony both established that some of these acts occurred during a time when Hanington was not living with Kelso and Hansel.

This first incident occurred when Kelso and Hansel were living with Kelso's parents.[5] Kelso stated that she encouraged Hansel to touch her breast with Hanington present, but did not remember Hanington having a camera or cell phone to record the first incident. Kelso also stated that Hanington made the child touch her vagina. She told Glidewell that Hanington occasionally videoed the abuse, but also admitted that she took two videos while Hanington was not present

_____

[5]Although there was a period of time when Kelso lived with Hanington's parents, no incidents of abuse were reported to have occurred there.

4

because he had instructed her to do so. Kelso told Glidewell and Cochrane that she took the first indecent video with Hansel while she was living in her own apartment because Hanington was sending text messages requesting that it be sent to him. Kelso, who did not work, told Glidewell that she continued her relationship with Hanington because he provided financial support for her, Hansel, and Hansel's half-brother.

Glidewell noted that during the interview, Kelso never claimed that Hanington had threatened her with serious bodily injury or death. She obtained 1,559 pages of text messages between Hanington and Kelso and saw nothing in those messages indicating that Kelso was being abused. Glidewell concluded that the text messages revealed that Kelso had no issues standing up to Hanington. In contrast to the statements Kelso made during her interview, Glidewell discovered that Hanington never texted Kelso regarding an attempt to have her engage in inappropriate activity with Hansel or any other child, causing Glidewell to conclude that Kelso had lied to gain sympathy and had consented to Hanington's violent BDSM acts in writing. The text messages and Kelso's handwritten consent to various acts of BDSM were admitted into evidence.

Troy William Bryan, who had previously worked with Hanington, testified that Hanington would brag about "beat[ing] the hell out of [Kelso]." He added that Hanington was six-feet tall and weighed 250 pounds. Hanington's ex-girlfriend, Jessica Lopez, who had a young son, testified that Hanington had a "horrible" reputation for peacefulness and abiding by the law. She testified that Hanington had a bad general reputation and that she was still afraid of him.

Hanington admitted both that he engaged in violent sexual behavior with Kelso and that it gave him pleasure to cause Kelso pain in sexual situations. Hanington further admitted that he

5

punished Kelso if she did not comply with his requests, but averred that these vicious punishments, bordering on torture, were done by prior consent of both parties. Hanington testified that he never asked Kelso to make video recordings of sexual abuse of Hansel and did not record any such videos.

As a result of Kelso's allegations against him, Hanington had also been indicted for sexual performance by a child, but the charges were later dismissed. Hanington testified that he wanted payback against Kelso because he had spent eight and one-half months in jail after she had claimed he was involved in Hansel's abuse.

Kelso testified on her own behalf during guilt/innocence. She told the jury that Hanington created the opportunity to control her by taking advantage of her lack of self-confidence and isolating her from her family and friends. She said that Hanington directed her how to dress, would prevent her from showering as punishment, would not allow her to seek medical treatment when needed, and instructed her to write down BDSM terms and describe what she liked about them. According to Kelso, Hanington stalked her when they were not together by logging into her Facebook and Yahoo accounts without her permission. Kelso testified that Hanington hit her "[a]lmost every day," raped her as punishment, and would choke her until she passed out, which placed her in fear of death. Kelso testified that Hanington did not leave bruises because he was a smart abuser. She added that Hanington still choked and spit on her while she was pregnant and that she feared retribution if she left the house.

Kelso testified that Hanington kept asking her about having sex with Hansel to the point that it "[wore] her down." She told the jury that Hanington also controlled whether Hansel and his

6

half-brother would be allowed to eat because he was her sole source of income and would withhold money from her if she was not nice to him. She said that while Hanington never actually said he was going to take Hansel and his half-brother away from her, he warned her that he would obtain custody of the children if she left him because she was unemployed and would have no place to live. Kelso admitted that she acquiesced to Hanington's demand for her to engage in sexual activity with Hansel because she was trying to appease him.

While Kelso admitted that she made two video recordings during the interview with Glidewell, she told the jury, who saw eight videos, "I don't remember it being me, and I don't remember it was me filming them." With respect to the first video, which was filmed at her parent's house, Kelso claimed that Hanington was in the room and that she was scared to tell her parents about the abuse because she did not want to disappoint them. Kelso admitted that she video recorded Hansel touching her breast on her own, but added that Hanington requested the video when he was working two minutes away from her apartment. When Kelso finally decided to leave Hanington, she left her cell phone behind because she did not want him to track her location.

During cross-examination, Kelso admitted that it would not have been difficult to call the police to report Hanington's abuse. Although Kelso told the jury that she was beaten almost every day, she told investigators that he had assaulted her only five or six times. She also clarified that Kelso had not physically harmed Hansel at the time the videos were filmed. Cross-examination further revealed that the text messages between her and Hanington failed to show any anger, demonstrated that Hanington never asked her to engage in inappropriate activity with Hansel by

text, and established that there were times when she would not suffer abuse as a result of her refusal to have sex with Hanington.

Sarah Smith, Hanington's youngest sister, testified that she lived with Kelso for a period of time at Hanington's parents house, became friends with her, and visited Kelso after she moved to her own apartment. According to Smith, Kelso told her that Hanington was controlling and exercised command over her telephone. Out of concern for Kelso, Smith asked if Hanington had placed her in fear, but never received an answer. Smith testified that Kelso had previously broken up with Hanington and was forced to quit her job because Hanington was her only means of transportation. Smith testified that Hanington stopped paying Kelso's cell phone bill after they broke up, but that Hanington's parents gave Kelso a telephone because she was pregnant. Smith testified that Kelso was on food stamps, received benefits from Women, Infants, and Children (WIC), and shopped for groceries with her. Smith also said that her mother provided for Kelso, Hansel, and Hansel's half-brother when they were living in her home. Smith told the jury that she felt surprised when Kelso and Hanington resumed their relationship and announced their engagement. When questioned by Smith, Kelso said that Hanington was verbally abusive, but loved her and would never lay a hand on her.

After hearing all of the evidence, the jury convicted Kelso of indecency with a child by contact.

## II.    There Was No Jury Charge Error

In her first two points of error, Kelso argues that the trial court erred in failing to submit instructions which would allow the jury (1) to determine whether Hanington's search of the cell

8

phone containing the videos violated any provision of the law, (2) to acquit her based on the defense of duress, and (3) to acquit her based on the justification of necessity.

## A. Standard of Review

"When we review a claim of jury charge error, we engage in a two-step process. First, we determine whether error exists; and then we determine whether sufficient harm resulted from the error to require reversal." *Rush v. State*, 549 S.W.3d 755, 759 (Tex. App.—Waco 2017, no pet.) (citing *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)). "We do not reach the harm issue, however, unless we first find error in the charge." *Id.* at 759–60.

## B. An Article 38.23 Instruction Was Not Warranted

Article 38.23 of the Texas Code of Criminal Procedure, to which reference is often made as the Texas exclusionary rule, states:

> (a) No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.
>
> In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

TEX. CODE CRIM. PROC. ANN. art. 38.23(a) (West 2018). The Texas Court of Criminal Appeals has stated that the following three predicates must be met in order to establish an entitlement to an Article 38.23 instruction: "(1) the evidence heard by the jury must raise an issue of fact, (2) the evidence on that fact must be affirmatively contested, and (3) the contested factual issue must be

9

material to the lawfulness of the challenged conduct." *Hamal v. State*, 390 S.W.3d 302, 306 (Tex. Crim. App. 2012); *see Madden v. State*, 242 S.W.3d 504, 517–18 (Tex. Crim. App. 2007). Further, the factual dispute must be related to how the evidence sought to be suppressed was obtained. *Robinson v. State*, 377 S.W.3d 712, 719 (Tex. Crim. App. 2012). "Where the issue raised by the evidence at trial does *not* involve controverted historical facts, but only the proper application of the law to undisputed facts, that issue is properly left to the determination of the trial court." *Id.*

Kelso argues that the evidence raised the fact issues of whether the cell phone "was willingly left behind" and "Hanington's authority to access the password-protected phone." In spite of these arguments, the circumstances by which Hanington accessed the evidence sought to be suppressed were undisputed.

Kelso testified that she left a cell phone behind because she did not want Hanington to locate her through the phone's tracking feature. While the testimony is unclear as to whether Kelso abandoned both phones for this reason, Kelso's appellate brief concedes that the cell phone containing the videos was left but alleges that the abandonment was due to Hanington's actions. This established that the cell phone at issue was "willingly left behind," and there was no testimony that Kelso unintentionally or mistakenly abandoned the cell phone. Also, Hanington testified that he found the cell phone well after Kelso had moved into the shelter and guessed her password to access its contents. Hanington further admitted that he did not have Kelso's permission to access the contents of the cell phone. These pertinent facts bearing on the question of whether Hanington had legal authority to access the cell phone were not in dispute.

10

Kelso also argues that the evidence created a fact issue as to whether her abandonment of the cell phone could be used to justify the search since it was caused by Hanington's actions. In order to sustain a finding on abandonment, "1) a defendant must intend to abandon property, and 2) a defendant must freely decide to abandon the property; the decision must not merely be the product of police misconduct." *Hawkins v. State*, 758 S.W.2d 255, 257–58 (Tex. Crim. App. 1988). The pivotal issue is whether the decision "to abandon the evidence was a *direct result* of the misconduct." *Id.* at 260. The State argues that there was no evidence that Hanington forced Kelso to leave her phone behind. Thus, the State contends, and we agree, that there was no evidence that Kelso's decision to abandon the cell phone was a direct action on Hanington's part.

Moreover, Kelso's argument that the abandonment of the cell phone was caused by Hanington's abuse is based on a misunderstanding of the law related to abandonment. As explained in *Comer v. State*,

> Abandonment cannot be voluntary if it has been coerced by unlawful police action such as approaching a suspect with the intention to arrest without probable cause of the initiation of an illegal investigatory stop or search. Therefore, when the police are illegally threatening to arrest and search a suspect, and the suspect attempts to divest himself of incriminating evidence that he reasonably believes will inevitably be discovered, his efforts do not constitute such an 'abandonment' or voluntary exposure as would waive his constitutional right to later move for suppression of the evidence thus obtained . . . .

*Comer v. State*, 754 S.W.2d 656, 658 (Tex. Crim. App. 1986) (quoting WILLIAM E. RINGEL, SEARCHS & SEIZURES, ARRESTS AND CONFESSIONS. § 8 (1985)). Misconduct, in relation to the concept of abandonment, contemplates illegal activity directly related to the search and seizure. *Id.*; *see Hamal*, 390 S.W.3d at 307; *Madden*, 242 S.W.3d at 517–18. Here, Kelso has alleged that the illegal activity by Hanington related to the search and seizure that occurred when he accessed

11

the contents of Kelso's cell phone without her authority.  Because this misconduct occurred after Kelso's abandonment of the cell phone, it could not have directly caused the abandonment.

Essentially, Kelso wanted a jury instruction on the proper application of the law to the undisputed facts related to the circumstances of how Hanington came to possess the video content from Kelso's cell phone.  Because there was no "genuine dispute about a material fact" relating to how the videos were obtained, Kelso was not entitled to an Article 38.23 instruction.  *Gullatt v. State*, 368 S.W.3d 559, 566 (Tex. App.—Waco 2011, pet. ref'd); *see Hamal*, 390 S.W.3d at 307; *Robinson*, 377 S.W.3d at 719–20; *Madden*, 242 S.W.3d at 518.  Rather, the issue "[was] properly left to the determination of the trial court."  *Robinson*, 377 S.W.3d at 719.  Therefore, we overrule Kelso's first point of error.

### C.      Kelso Was Not Entitled to an Instruction Regarding Duress or Necessity

Kelso requested jury instructions on the defense of duress and the necessity justification. In her second point of error, Kelso argues that the trial court erred in denying the defensive instructions.[6]

"[A]n accused has the right to an instruction on any defensive issue raised by the evidence, whether that evidence is weak or strong, unimpeached or contradicted, and regardless of what the trial court may or may not think about the credibility of the defense."  *Hamel v. State*, 916 S.W.2d 491, 493 (Tex. Crim. App. 1996).  A defense may be supported or raised by evidence "from any source, on each element of the defense that, if believed by the jury, would support a rational

---

[6]Kelso cites to *In re A.C.*, 48 S.W.3d 899 (Tex. App.—Fort Worth 2001, pet. denied), a case that dealt with terroristic threats and did not involve the defense of duress or the justification of necessity in support of her argument.  We do not find this case directly applicable.

12

inference that that element is true." *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007). This means that an accused is entitled to a defensive instruction, whether the issue is raised by a defendant's testimony alone or otherwise. *Miller v. State*, 815 S.W.2d 582, 585 (Tex. Crim. App. 1991); *Hayes v. State*, 728 S.W.2d 804, 807 (Tex. Crim. App. 1987). When reviewing a trial court's decision to deny a requested defensive instruction, "we view the evidence in the light most favorable to the defendant's requested submission." *Bufkin v. State*, 207 S.W.3d 779, 781 (Tex. Crim. App. 2006).

The affirmative defense of duress is provided for by Section 8.05 of the Texas Penal Code, which states, in pertinent part:

> (a)     It is an affirmative defense to prosecution that the actor engaged in the proscribed conduct because he was compelled to do so by threat of imminent death or serious bodily injury to himself or another.
>
> . . . .
>
> (c)     Compulsion within the meaning of this section exists only if the force or threat of force would render a person of reasonable firmness incapable of resisting the pressure.
>
> (d)     The defense provided by this section is unavailable if the actor intentionally, knowingly, or recklessly placed himself in a situation in which it was probable that [s]he would be subjected to compulsion.
>
> (e)     It is no defense that a person acted at the command or persuasion of his spouse, unless he acted under compulsion that would establish a defense under this section.

TEX. PENAL CODE ANN. § 8.05 (West 2011). The justification of necessity provides, "Conduct is justified if . . . the actor reasonably believes the conduct is immediately necessary to avoid imminent harm" and "the desirability and urgency of avoiding the harm clearly outweigh,

13

according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct." TEX. PENAL CODE ANN. § 9.22 (West 2011).

Here, Kelso's requested jury instructions identified the degree of harm in relation to the necessity defense as "death of or seriously bodily injury to Hansel, Miranda Kelso, or Miranda Kelso's unborn child." Accordingly, as applied to this case, both parties agree that the justification of necessity shared a common requirement with the affirmative defense of duress—threat of imminent death or serious bodily injury to Kelso or another.

"'Imminent' means something that is immediate, something that is going to happen now." *Murkledove v. State*, 437 S.W.3d 17, 25 (Tex. App.—Fort Worth 2014, pet. dism'd, untimely filed) (citing *Dewalt v. State*, 307 S.W.3d 437, 454 (Tex. App.—Austin 2010, pet. ref'd)). "Harm is imminent when there is an emergency situation and it is 'immediately necessary' to avoid that harm, in other words, when a 'split-second decision' is required without time to consider the law." *Id.* (quoting *Pennington v. State*, 54 S.W.3d 852, 857 (Tex. App.—Fort Worth 2001, pet. ref'd)). Imminence "has two components: (1) the person making the threat must intend and be prepared to carry out the threat immediately, and (2) the threat must be predicated on the threatened person's failure to commit the charged offense immediately." *Cormier v. State*, 540 S.W.3d 185, 190 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (citing *Devine v. State*, 786 S.W.2d 268, 270–71 (Tex. Crim. App. 1989); *Anguish v. State*, 991 S.W.2d 883, 886 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd)); *see Ramirez v. State*, 336 S.W.3d 846, 851 (Tex. App.—Amarillo 2011, pet. ref'd). Imminent harm must be shown by affirmative evidence. *Darty v. State*, 994 S.W.2d 215, 218–19 (Tex. App.—San Antonio 1999, pet. ref'd); *Brazelton v. State*, 947 S.W.2d 644, 648 (Tex. App.—

14

Fort Worth 1997, no pet.) (citing *Johnson v. State*, 650 S.W.2d 414, 416 (Tex. Crim. App. 1983),

*overruled on other grounds by Boget v. State*, 74 S.W.3d 23, 31 (Tex. Crim. App. 2002)).  A threat

of harm at some indefinite time in the future is insufficient to satisfy the requirement of imminence.

*Devine v. State*, 786 S.W.2d 268, 270 (Tex. Crim. App. 1989); *Ramirez v. State*, 336 S.W.3d 846,

851–52 (Tex. App.—Amarillo 2011, pet. ref'd); *Anguish*, 991 S.W.2d at 886.

Here, while we readily acknowledge that there was ample evidence of past physical and

sexual abuse by Hanington, we find that Kelso's testimony, which was the only evidence bearing

on the issue of whether she was entitled to the requested instructions, fell short of creating a fact

issue on whether she, Hansel, or her unborn child were facing threat of imminent death or serious

bodily injury when she committed the offenses.  Kelso did not testify that Hanington made any

specific threats to kill or harm her, Hansel, or her unborn child if Kelso refused to engage in sexual

acts with Hansel.  Rather, Kelso's testimony, at best, showed that she committed the offenses based

on a generalized fear of death or serious bodily injury based on Hanington's past reactions when

she had refused to engage in other sexual activity he had requested.[7]  She added that at the time

the videos were taken, Hanington had never physically harmed Hansel.

Additionally, Kelso testified that she agreed to engage in the indecent acts with Hansel

because Hanington kept asking her to do so until his requests "[wore] her down."  Kelso testified

that Hanington was sometimes present when the acts occurred, but admitted that she had filmed

the video of Hansel touching her breast when Hanington was working his shift at Walmart, which

---

[7]Kelso testified that she feared Hanington was capable of causing serious bodily injury, but she did not specifically state that he had ever caused her serious bodily injury.

15

was two minutes away by car. Even though Kelso testified that Hanington was in the room during some of the filming, she did not testify to any specific threat made by him and did not show that any threat would be carried out if she did not agree to commit the offenses immediately. Kelso further stated that she engaged in the indecent acts instead of refusing to do so because she was trying to appease her husband. She admitted that it would not have been hard to call 9-1-1 instead of engaging in the indecent sexual acts with the child.

We conclude that there was no evidence that Hanington intended and was prepared to carry out any threat of death or serious bodily injury immediately at the time that Kelso committed the offenses, or that Kelso's actions required a split-section decision as contemplated by the immediacy requirement. Instead, we find that at best, the evidence showed Kelso engaged in the acts based on her generalized fear of what might occur if she refused. However, "more than a generalized fear of harm is required to raise the issue of imminent harm." *Stefanoff v. State*, 78 S.W.3d 496, 501 (Tex. App.—Austin 2002, pet. ref'd) (citing *Brazelton*, 947 S.W.2d at 648). Accordingly, even when viewing the evidence in the light most favorable to Kelso's requested submissions, we conclude that the trial court did not err in denying, as requested, the jury instructions on the defense of duress and the justification of necessity. We overrule Kelso's second point of error.

## III. The Trial Court Did Not Abuse Its Discretion in Denying Kelso's Request for a Suppression Hearing in the Middle of Trial

Kelso filed a motion to suppress the videos obtained from her cell phone on the day of trial, presented the motion to the trial court after the first witness began her testimony, and asked for a suppression hearing outside of the jury's presence. The State argued that Kelso's filing violated

16

the trial court's standing pretrial order, which mandated that motions to suppress be filed earlier. The trial court carried the suppression motion with the case and denied Kelso a separate evidentiary hearing because there were "at least five different ways in which this matter could have previously been brought up." Kelso argues that the trial court erred in failing to grant her request for a mid-trial suppression hearing. We disagree.

"A motion to suppress is a specialized objection regarding the admissibility of evidence." *Wade v. State*, 814 S.W.2d 763, 764 (Tex. App.—Waco 1991, no pet.). "Article 28.01 of the [Texas] Code of Criminal Procedure vests the trial court with the discretion of whether to hold a hearing on a pre-trial motion to suppress." *Id.* (citing TEX. CODE CRIM. PROC. ANN. art. 28.01; *Calloway v. State*, 743 S.W.2d 645, 649 (Tex. Crim. App. 1988); *Roberts v. State*, 545 S.W.2d 157, 158 (Tex. Crim. App. 1977)). "[A] trial court is not required to rule on a motion to suppress before trial, and sometimes a trial court may find it useful to carry the motion along with the trial on the merits." *York v. State*, 342 S.W.3d 528, 550–51 (Tex. Crim. App. 2011) (footnotes omitted) (citations omitted). Therefore, "[e]ven if the defendant specifically requests a pre-trial suppression hearing, no error is presented if the court declines to hear the matter." *Wade*, 814 S.W.3d at 764. This is because nothing is lost by the trial court's decision not to hold a hearing on suppression issues since "a trial court may revisit [these issues] at its discretion at any time during the course of a trial." *Black v. State*, 362 S.W.3d 626, 633 (Tex. Crim. App. 2012).

Here, we find no abuse of discretion in the trial court's decision to deny Kelso's request for a mid-trial suppression hearing. We overrule her third point of error.

17

**IV.  The Trial Court Properly Denied Kelso's Suppression Motion**

In her fourth point of error, Kelso argues that the trial court erred in eventually admitting eight videos recovered from a cell phone after overruling her motion to suppress.  We disagree.

**A.  Standard of Review**

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review, giving almost total deference to the trial court's determination of historical facts that turn on credibility and demeanor while reviewing de novo other application-of-law-to-fact issues.  *See Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000).  Appellate courts should also afford nearly total deference to trial court rulings on application-of-law-to-fact questions, also known as mixed questions of law and fact, if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor.  *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).  Appellate courts may review mixed questions of law and fact not falling within this category on a de novo basis.  *Id.*  We must affirm the decision if it is correct on any theory of law that finds support in the record. *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002).

**B.  Applicable Law**

The Texas exclusionary rule found in Article 38.23 is "broader than its federal counterpart"; it applies to "'other persons,' even when those other persons are not acting in conjunction with, or at the request of, government officials." *Miles v. State*, 241 S.W.3d 28, 34, 36 (Tex. Crim. App. 2007); *see Cobb v. State*, 85 S.W.3d 258, 270–71 (Tex. Crim. App. 2002).  However, because the Fourth Amendment only applies to government action, "[n]either the Fourth

18

Amendment nor the Texas Constitution requires trial courts to exclude incriminating evidence that was obtained by a private citizen's illegal search." *Cobb*, 85 S.W.3d at 270–71. Rather, "[i]f a defendant challenges the admissibility of evidence under article 38.23(a) on the ground it was wrongfully obtained by a private person in a private capacity, the defendant must establish that the private person obtained that evidence in violation of [another] law." *Baird v. State*, 379 S.W.3d 353, 357 (Tex. App.—Waco 2012), *aff'd*, 398 S.W.3d 220 (Tex. Crim. App. 2013). "[T]he burden of persuasion is properly and permanently placed upon the shoulders of the moving party. When a criminal defendant claims the right to protection under an exclusionary rule of evidence, it is his task to prove his case." *Pham v. State*, 175 S.W.3d 767, 773 (Tex. Crim. App. 2005) (quoting *Mattei v. State*, 455 S.W.2d 761, 766 (Tex. Crim. App. 1970)).

Here, Kelso argues that Hanington violated Section 33.02 of the Texas Penal Code, which states, "A person commits an offense if the person knowingly accesses a computer, computer network, or computer system without the effective consent of the owner." TEX. PENAL CODE ANN. § 33.02 (West 2016). The term "owner" as used in Section 33.02 means "a person who . . . has title to the property, possession of the property, whether lawful or not, or a greater right to possession of the property than the actor." TEX. PENAL CODE ANN. § 33.01(15) (West Supp. 2017).

Before the time that the trial court made its suppression ruling, Hanington testified that he found the telephone in a closet two months after Kelso had left.[8] Modern "smart phones" "place vast quantities of personal information literally in the hands of individuals." *Thomas v. State*, Nos.

---

[8]The State argues that these facts established that Kelso had no standing to contest Hanington's search. For the purposes of this analysis, we will assume, without deciding, that Kelso had standing.

19

14-16-00665-CR & 14-16-00666-CR, 2017 WL 4400116, at *3 (Tex. App.—Houston [14th Dist.] Oct. 3, 2017, pet. ref'd) (quoting *Riley v. California*, 134 S.Ct. 2473, 2485 (2014)). "Searching a person's cell phone is like searching his home desk, computer, bank vault, and medicine cabinet all at once." *Id*. (quoting *State v. Granville*, 423 S.W.3d 399, 415 (Tex. Crim. App. 2014)). "Given these realities, people enjoy a reasonable, subjective, and legitimate expectation of privacy in the contents of their smart phones." *Id*. Thus, a search of a person's cell phone by a private citizen may implicate Article 38.23. However, a person may lose a reasonable and legitimate expectation of privacy in the contents of her cell phone "under some circumstances, including if [s]he abandons [her] cell phone." *State v. Granville*, 423 S.W.3d 399, 409 (Tex. Crim. App. 2014).

## C.     Analysis

Under Section 33.01 of the Texas Penal Code, Hanington was also considered to be an owner of the telephone because he had possession of the property. "When the trial court does not make explicit findings of fact, as is the case here, we infer the necessary factual findings that support the trial court's ruling if the record evidence, viewed in the light most favorable to the ruling, supports these implied fact[-]findings." *Chung v. State*, 475 S.W.3d 378, 382–83 (Tex. App.—Waco 2014, pet. ref'd) (citing *State v. Kelly*, 204 S.W.3d 808, 819 (Tex. Crim. App. 2006)). Because Kelso had left the cell phone with Hanington for a considerable period of time and did not ask for its return, the trial court was free to make a factual finding that she willingly abandoned the cell phone and, thus, did not have a greater right to possess it. *See Mouton v. State*, 101 S.W.3d 686, 690–91 (Tex. App.—Texarkana 2003, no pet.) (concluding that an implied finding of abandonment supported the trial court's decision to deny defendant's suppression motion).

20

Furthermore, in her recorded interview with Glidewell, Kelso said she had thrown away the phone which she had used to create the recordings. Therefore, Kelso did not establish that Hanington violated Section 33.02 of the Texas Penal Code.

We overrule Kelso's fourth point of error.

## V. The Trial Court Did Not Abuse Its Discretion in Making the Evidentiary Rulings Preserved for Our Review

### A. Standard of Review

"We review the trial court's decision to admit or exclude evidence for an abuse of discretion." *Gerron v. State*, 524 S.W.3d 308, 323 (Tex. App.—Waco 2016, pet. ref'd) (citing *McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005)). "The trial court abuses its discretion only when the decision lies outside the zone of reasonable disagreement." *Washington v. State*, 457 S.W.3d 634, 635 (Tex. App.—Waco 2015, no pet.) (citing *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010)).

### B. The Communications Between Kelso and her Husband Were Properly Admitted

#### 1. Spousal Privilege Did Not Apply

Kelso objected to the introduction of (1) text messages between her and Hanington and (2) her handwritten notes related to BDSM, on the ground that their admission violated spousal privilege. On appeal, Kelso argues that the trial court erred in overruling these objections.

Generally, "[a] person has a privilege to refuse to disclose and to prevent any other person from disclosing a confidential communication made to the person's spouse while they were married." TEX. R. EVID. 504(a)(2). However, spousal privilege does not apply "[i]n a . . .

21

proceeding in which a party is accused of conduct that, if proved, is a crime against . . . any minor child." Tex. R. Evid. 504(a)(4)(C)(i). Because Kelso was accused of a crime against Hansel, a minor child, spousal privilege did not apply. *See id.*; *Hernandez v. State*, 205 S.W.3d 555, 559 (Tex. App.—Amarillo 2006, pet. ref'd) (citing *Huddleston v. State*, 997 S.W.2d 319, 321 (Tex. App.—Houston [1st Dist.] 1999, no pet.)).

## 2.     Kelso Did Not Preserve Her Objections to the Text Messages

According to Kelso, the State proffered "a hundred thousand some odd text messages that look[ed] . . . four inches thick, six inches thick." Kelso objected to "a volume full of thousands and thousands of messages" "because they're clearly not relevant. If you have a message saying ugh or I'm eating, that's certainly not relevant." Kelso also lodged a general Rule 403 objection, which was overruled by the trial court. She further stated, "If [the State] want[s] to pick and choose certain ones and offer them, that's fine, but they need to do that, not offer all of them." On appeal, Kelso argues that the trial court erred in overruling her objections and admitting the text messages. We find this issue unpreserved.

When an exhibit contains both admissible and inadmissible evidence, the burden is on the objecting party to specifically point out which portion is inadmissible. *Whitaker v. State*, 286 S.W.3d 355, 369 (Tex. Crim. App. 2009) (citing *Hernandez v. State*, 599 S.W.2d 614, 617 (Tex. Crim. App. 1980) (op. on reh'g)). A trial court is not obligated to search through an exhibit and segregate the admissible evidence from the inadmissible. *Id.* Instead, "the trial court may safely admit it or exclude it all, and the losing party, no matter who he is, will be made to suffer on appeal the consequences of his insufficiently specific offer or objection." *Richter v. State*, 482 S.W.3d

22

288, 298 (Tex. App.—Texarkana 2015, no pet.) (quoting *Whitaker*, 286 S.W.3d at 369); *see Fears v. State*, 479 S.W.3d 315, 334 (Tex. App.—Corpus Christi 2015, pet. ref'd) (citing *Willover v. State*, 70 S.W.3d 841, 847 (Tex. Crim. App. 2002)). Because Kelso did not "specifically point out which portions . . . were objected to as inadmissible," her "trial objections were insufficient to preserve any [Rule 401 or 403] error" with respect to the text messages. *Whitaker*, 286 S.W.3d at 369.

### 3. Kelso Did Not Preserve her Argument with Respect to the Handwritten Notes

The State proffered Kelso's handwritten notes informing Hanington of the types of BDSM activity she would be interested in exploring. Kelso objected to the admission of this evidence only on the ground of spousal privilege. On appeal, however, Kelso argues that the notes were irrelevant and should have been excluded under Rule 403. The State argues that Kelso has failed to preserve her Rule 401 and 403 objections.[9] We agree.

To preserve a complaint for our review, a party must first present to the trial court a timely objection stating the specific grounds for the desired ruling if not apparent from the context. TEX. R. APP. P. 33.1(a)(1). Further, the trial court must have ruled on the objection, either expressly or implicitly. TEX. R. APP. P. 33.1(a)(2). The reporter's record demonstrates that Kelso did not raise Rule 401 or 403 objections when the State offered the handwritten notes into evidence, and nothing suggests that the trial court considered the arguments now raised by Kelso on appeal. "[A] party's 'point of error on appeal must comport with the objection made at trial.'" *Grant v. State*, 345

---

[9] In response, Kelso argues that her objections to the text messages were sufficient to preserve her relevance and Rule 403 arguments with respect to the handwritten notes.

S.W.3d 509, 512 (Tex. App.—Waco 2011, pet. ref'd) (quoting *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002)). We find that Kelso failed to preserve the Rule 401 and 403 issues for our review.

We overrule Kelso's fifth point of error.

**C.    The Trial Court Properly Denied Impeachment by Specific Instances of Conduct**

At trial, Lopez attacked Hanington's credibility by testifying about his bad reputation for truthfulness. *See* TEX. R. EVID. 608(a). During Hanington's cross-examination, Kelso sought to introduce a written statement from Lopez alleging that Hanington had verbally, mentally, physically, and sexually abused Lopez on a daily basis. *See* TEX. R. EVID. 613. The evidence established, by specific instances of conduct, that Hanington committed, toward Lopez, the same kinds of abusive acts and rape described by Kelso's testimony. Kelso also sought to admit evidence that Hanington stalked Lopez, indicated that he had sexual fantasies involving Lopez' young child, asked Lopez to engage in sexual activity with her son, searched the internet for videos depicting incestuous relationships, and had offered to pay for such videos. In her last point of error on appeal, Kelso argues that the trial court erred in disallowing the evidence.

"Except for a criminal conviction . . . , a party may not inquire into or offer extrinsic evidence to prove specific instances of the witness's conduct in order to attack or support the witness's character for truthfulness." TEX. R. EVID. 608(b); *see Lopez v. State*, 18 S.W.3d 220, 223 (Tex. Crim. App. 2000). Kelso acknowledges this Rule, but argues that the specific instances of conduct were admissible to demonstrate Hanington's bias and motive to testify against her in favor of the State. "[T]he exposure of a witness' motivation in testifying is a proper and important

24

function of the constitutionally protected right of cross-examination." *Hammer v. State*, 296 S.W.3d 555, 562 (Tex. Crim. App. 2009) (quoting *Davis v. Alaska*, 415 U.S. 308, 316–17 (1974)). However, "[t]his right is not unqualified." *Id.* at 561. Even when attempting to demonstrate bias or motive against another party, "[t]he right of the defendant to cross-examine the witness, or impeach him with extrinsic evidence, is limited by the trial court's authority to preclude, among other things, confusion of the issues, harassment, endangerment to the witness, needless delay, and the admissibility of highly prejudicial, repetitive and irrelevant or marginally relevant evidence."[10] *Rodriquez v. State*, 934 S.W.2d 881, 885 (Tex. App.—Waco 1996, no pet.).

"The proponent of evidence to show bias must show that the evidence is relevant." *Woods v. State*, 152 S.W.3d 105, 111 (Tex. Crim. App. 2004) (citing *Carpenter v. State*, 979 S.W.2d 633, 634 (Tex. Crim. App. 1998)). The State argued that Hanington's acts against Lopez and internet search history were "not relevant to the issue at hand which is whether or not [Hansel] was sexually abused" by Kelso. In response, Kelso argues that the excluded evidence was relevant to her defensive issues of duress and necessity. We have already determined that Kelso was not entitled to an instruction on these defensive issues because there was no evidence that Hansel's sexual abuse was required to prevent imminent death or serious bodily injury to herself or another. Accordingly, we find no abuse of discretion in the trial court's decision to exclude Lopez' statement or Hanington's internet search history. We overrule Kelso's last point of error.

---

[10]We also note that Kelso had already established that Hanington sought payback against her and wanted an upper hand in their pending divorce. Thus, because Kelso sought to introduce Lopez' testimony as evidence of additional bias and motive, the trial court could have determined there was less need for such evidence.

## VI.      Conclusion

We affirm the trial court's judgment.


Bailey C. Moseley
Justice

Date Submitted:      September 19, 2018
Date Decided:        September 28, 2018

Publish