

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-24-00079-CR

DAMOND COTTON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 396th District Court
Tarrant County, Texas
Trial Court No. 1718976

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

MEMORANDUM OPINION

A Tarrant County[1] jury convicted Damond Cotton of first-degree felony murder with a firearm and sentenced him to sixty-five years in prison. *See* TEX. PENAL CODE ANN. § 19.02(c) (Supp.). In two points of error, Cotton argues that (1) the trial court erred in admitting certain hearsay evidence and (2) the nonaccomplice evidence is insufficient to connect him to the offense. Because (1) Cotton did not preserve any error in admitting the complained-of hearsay evidence and (2) the nonaccomplice evidence tended to connect Cotton to the offense, we affirm the trial court's judgment.

## I.    Background

Cotton was convicted of being the gunman in a murder orchestrated by an inmate in the Tarrant County Jail.

The inmate, Braylin Brown, called his father, Kevin Brown, Sr., from jail via a three-way call initiated by Braylin's girlfriend, Alexis Abeyta, on January 25, 2022. During the call, Braylin asked Kevin to check the mailbox. Kevin went outside to the mailbox, and after he checked the mailbox and was still standing beside it, a black Chrysler 200 drove by, and the backseat passenger shot and killed Kevin.

The Fort Worth Police Department (FWPD) determined, from surveillance recordings, that the car belonged to Cotton's girlfriend, Ashlynn Durham. Michael Sones, a homicide detective with the FWPD, testified that Durham admitted she was driving the car that appeared in

---

[1]This appeal was transferred to this Court from the Second Court of Appeals pursuant to a Texas Supreme Court docket equalization order. *See* TEX. GOV'T CODE ANN. § 73.001 (Supp.). Accordingly, we apply the precedent of the Second Court of Appeals in deciding this case to the extent that it conflicts with our own. *See* TEX. R. APP. P. 41.3.

the recordings. Durham also told Sones that Cotton was with her, riding in the backseat, and that he had a gun. Durham described the route she took to Kevin's house and told Sones that, as they drove by, she heard gunshots.

Durham directed the FWPD to an apartment at the Maxwell Apartments, which they later learned had been leased in her name, and the FWPD obtained a search warrant. When the warrant was executed, Cotton was there. FWPD located, among other items in the apartment, handwritten letters from Cotton to Braylin and a gun matching the one described by Durham that could not be eliminated as the murder weapon. Several days after an interview with Cotton, FWPD arrested him and charged him with Kevin's murder.

The State charged Cotton with felony murder with a firearm. *See* TEX. PENAL CODE ANN. § 19.02(c). The State also charged Abeyta and Durham as accomplices to the murder, and both women testified at trial. In addition to Abeyta's, Durham's, and other witnesses' testimony, evidence was admitted of Braylin's conversations using a tablet from jail, as well as other social-media evidence.

A large portion of the State's case centered on Sones's testimony and a timeline that he developed. Sones testified that prisoners in the Tarrant County Jail had access to a tablet that has a messaging application through which a prisoner could send and receive text messages. Sones obtained Braylin's entire tablet communication history—over 75,000 messages. Sones learned from the tablet that several people, including Abeyta, facilitated indirect, copy-and-paste messaging between Cotton and Braylin through relaying messages received from Braylin's tablet

3

to Cotton or forwarding messages received from Cotton to Braylin's tablet. Sones also testified that Durham and Cotton most commonly communicated through Instagram.

Sones testified that he compiled a timeline summary of the social-media records, plus a number of phone records and Cash App transactions for the purpose of "involv[ing] only the data that was specifically connected to [the] offense." Sones said the tablet communication with each individual user had its own separate timeline, so he integrated those chronologically, tracking conversations between Braylin and several different people. He did the same thing with phone records, including calls with Abeyta and Cotton. The timeline did not include the entirety of the records, but only what was relevant to his investigation, and it did not include any of Sones's own commentary.

Sones concluded from going through all the records that Braylin orchestrated, while in jail, the murder of Kevin, with Cotton serving as the shooter. Although Cotton objected to the admission of the separate exhibits comprising Braylin's tablet communications and Durham's Instagram records, Cotton explicitly had "[n]o objection" to the admission of Sones's timeline.

The timeline started on December 16, 2021, when Braylin reached out to Cotton and confirmed that Cotton had a gun. The timeline contained little information for the next month but continued one week prior to the murder when Braylin again reached out to Cotton and told Cotton that he needed help with a "play," or an illegal act. Braylin's conversation with Cotton continued two days later when Braylin presented Cotton two alternative methods for carrying out the murder: one taking place in a restroom and the other outside Kevin's front door. Two days

4

before the murder, Cotton relayed to Braylin through his tablet: "Tell [Braylin] im ready im [on that]."[2]

The same day Cotton said he was ready, he messaged Durham through Instagram, "Needa go past this one place." Durham responded, "Ask me nicely." Cotton said, "I juss wanna see if he still stay there [real quick]." And later, Durham said, "I'm outside."

Also, on that same day and during that same timeframe, Braylin learned Cotton needed ammunition, and he reached out to Cotton to find out what type. Braylin then asked Abeyta to purchase ammunition. Abeyta called Cotton on the phone to arrange to meet Cotton and find out the exact type of ammunition he needed. Within one-half hour of Durham telling Cotton she was outside, and about four minutes after Abeyta called Cotton, Cotton messaged another party on Instagram telling that person he was about to meet someone to get bullets.

On January 24, the day before the shooting, Braylin indicated that he knew the ammunition had been given to Cotton. Cotton later messaged Durham, "Let's go by that one house." Braylin conveyed to Cotton that Kevin would be home during the daytime and that he should "just be over there . . . watching." Cotton responded, seeking reassurance from Braylin that he "ha[d] his back," Cotton told Brown that he had his back, and Braylin responded, "tell [Cotton] I got him [for sure]." Cotton responded, "1000% long as he got me i got him 1000%."

Durham then messaged Cotton to advise that she needed gas money. Within three hours, Cotton let Braylin know that his ride had not worked out, and Braylin responded that Cotton might have to do it the next day. Later that night, another party sent money to Durham, and

---

[2]In relaying the social-media communications included in the timeline, we use the grammar and punctuation as originally communicated.

Durham then messaged Cotton that she would tell them the next day, stating, "We Can [go on ahead and] Get [this s—t] Done."

On January 25, the day of the murder, Durham messaged Cotton several times indicating she was coming to pick him up, then was on her way, then, about one hour before the murder, that he should come outside. The timeframe immediately surrounding the murder was punctuated by several phone calls. Among them was a three-way call in which Abeyta was on the phone with Braylin and Kevin immediately before the shooting. Abeyta attempted to call Cotton immediately after the shooting, but his phone was off. About nine minutes later, Cotton called Abeyta, and Abeyta then established a three-way call between herself, Cotton, and Braylin.

In addition to Sones's testimony and his timeline, the jury saw video recordings from several surveillance cameras. In one video, Kevin can be seen walking down his driveway to the mailbox. Kevin was talking on his cell phone while he checked the mailbox. Durham's vehicle rounded the corner near Kevin's house. An individual can be seen with a gun hanging out the rear passenger's side window. The individual can be seen firing several shots, and debris can be seen coming from the mailbox as it was struck. Kevin was shot in the head and collapsed, and the vehicle sped away. Kevin was soon transported to a local hospital, where he was pronounced dead.

The jury found Cotton guilty and sentenced him to sixty-five years' incarceration. Cotton appealed.

## II.    Any Error in Admitting Hearsay Evidence Was Unpreserved

In his second point of error, which we address first for analysis purposes, Cotton complains of the admission of hearsay evidence in the form of "Brown's voluminous tablet conversations with numerous people" and Durham's Instagram records.

"We review a trial court's ruling on the admissibility of evidence for an abuse of discretion." *Redmond v. State*, 629 S.W.3d 534, 541 (Tex. App.—Fort Worth 2021, pet. ref'd) (citing *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000)). "Hearsay" is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." TEX. R. EVID. 801(d). Generally, hearsay is inadmissible. TEX. R. EVID. 802.

Cotton's objections to Braylin's tablet records and Durham's Instagram records occurred as part of an exchange regarding a series of exhibits, including Braylin's jail records, that were introduced through Sones. Cotton objected to the introduction of the entirety of Braylin's jail records on grounds of relevance and hearsay. The trial court overruled the objections but granted a running objection to the jail records, by exhibit number: "you may have a running objection to State's 123." In succession, the State then offered Braylin's tablet records and Durham's Instagram records. As to each, Cotton urged: "Same objections, Your Honor." As to each, the trial court overruled the objections, but gave a running objection to the records, by exhibit number.

A party cannot raise a complaint on appeal "unless the record shows that the party made a timely objection or motion stating the grounds for the requested ruling . . . [and] obtain[ed] a

7

ruling from the trial court or object[ed] to the trial court's refusal to rule on the objection or motion." *Null v. State*, 690 S.W.3d 305, 318 (Tex. Crim App. 2024) (citing TEX. R. APP. P. 33.1). "Generally, to preserve error in the admission of evidence, a party must make a proper objection, get a ruling on that objection, and continue to object each time the allegedly inadmissible evidence—or other evidence proving the same underlying fact—is offered." *Redmond*, 629 S.W.3d at 547 (citing *Lane v. State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004)).

Contrary to Cotton's assertion on appeal that "[a]ll of the information contained on [Braylin's] tablet and [Durham's] Instagram [records] w[as] inadmissible hearsay," an inspection of Sones's testimony and the social-media records indicates that the records contained numerous non-hearsay statements. Both Braylin's tablet records and Durham's Instagram records contained statements made by Cotton,[3] which are non-hearsay under Rule 801(e)(2)(A) of the Texas Rule of Evidence. *See* TEX. R. EVID. 801(e)(2)(A). The records also contain numerous statements attributed to Cotton—non-hearsay statements made by persons who Cotton authorized to make them. *See* TEX. R. EVID. 801(e)(2)(C). Finally, most, if not all, of the statements included in Sones's timeline are statements made by Cotton's co-conspirators during the plot to kill Kevin "during and in furtherance of the conspiracy." TEX. R. EVID. 801(e)(2)(E).

Yet, at trial, when objecting to Braylin's tablet records and Durham's Instagram records, Cotton made no attempt to segregate hearsay statements from non-hearsay statements contained

---

[3]Sones testified that Cotton was often identified in the social-media records using the nickname "Mon." Sones determined Mon was Cotton because Cotton's cell phone number was given in the records in response to Braylin's request for Mon's number and Mon composed a portion of the name on Cotton's Instagram account.

in the exhibits. "When an exhibit contains both admissible and inadmissible evidence, the burden is on the objecting party to specifically point out which portion is inadmissible." *Norris v. State*, No. 02-23-00298-CR, 2024 WL 3458077, at *2 (Tex. App.—Fort Worth July 18, 2024, pet. ref'd) (mem. op., not designated for publication) (quoting *Kelso v. State*, 562 S.W.3d 120, 136 (Tex. App.—Texarkana 2018, pet. ref'd)) (holding appellant failed to preserve error in objecting to voluminous text messages because he failed to segregate the inadmissible portions from the admissible portions); *see Whitaker v. State*, 286 S.W.3d 355, 369 (Tex. Crim. App. 2009). "In the absence of a specific objection, '[a] trial court is not obligated to search through an exhibit and segregate the admissible evidence from the inadmissible' and 'may safely admit it or exclude it all.'" *Norris*, 2024 WL 3458077, at *2 (alteration in original) (quoting *Kelso*, 562 S.W.3d at 136). "When this occurs, 'the losing party, no matter who he is, will be made to suffer on appeal the consequences of his insufficiently specific offer or objection.'" *Id.* (quoting *Kelso*, 562 S.W.3d at 136).

Under these circumstances, we conclude Cotton's broad hearsay objections did not preserve error as to the admission of any portion of Braylin's tablet records or Durham's Instagram records because Cotton did not segregate the inadmissible portions of the evidence from the admissible portions. *See id.*; *Whitaker*, 286 S.W.3d at 369.

On appeal, Cotton also raises more specific objections to certain discussions within the social-media records between Braylin and different third parties, complaining that some of the discussions were double hearsay and others attributed to Cotton were not authenticated. As stated above, Cotton did not raise specific objections to any portion of the social-media records

9

at trial, and neither did he raise double-hearsay and authentication objections, thus, he did not preserve those objections for appeal. *See* TEX. R. APP. P. 33.1; *Ricketts v. State*, 89 S.W.3d 312, 319 n.1 (Tex. App.—Fort Worth 2002, pets. ref'd) (holding that general hearsay objection did not preserve double-hearsay complaint); *Cain v. State*, 621 S.W.3d 75, 79 (Tex. App.—Fort Worth 2021, pet. ref'd) (holding that failure to challenge authorship of social-media messages at trial did not preserve error for review).

On this record, Cotton's blanket hearsay objections were insufficient to preserve any error on the admission of any portion of the social-media records because Cotton's hearsay objections did not specifically point out which portions of the records were inadmissible. *See Whitaker*, 286 S.W.3d at 369; *Simpson v. State*, No. 02-23-00266-CR, 2024 WL 3977222, at *5–6 (Tex. App.—Fort Worth Aug. 29, 2024, no pet.) (mem. op., not designated for publication). The trial court was not obligated to segregate the inadmissible portions of the social media records from the admissible portions. *See Whitaker*, 286 S.W.3d at 369; *Simpson*, 2024 WL 3977222, at *5–6. Further, Cotton failed to preserve his remaining complaints for review. *See Ricketts*, 89 S.W.3d at 319 n.1; *Cain*, 621 S.W.3d at 79.

We overrule Cotton's point of error regarding the admission of Braylin's tablet records and Durham's Instagram records.

10

**III.    The Evidence Other than Accomplice-Witness Testimony Tended to Connect Cotton to the Offense**

In his first point of error, Cotton argues that the accomplice-witness testimony was not sufficiently corroborated to connect him to the offense.[4]  The State responds that nonaccomplice evidence "connect[ed] [Cotton] to the crime sufficiently enough that the accomplice testimony could be considered evidence of guilt by the jury."

The accomplice-witness rule states:  "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."  TEX. CODE CRIM. PROC. ANN. art. 38.14.  "The accomplice-witness rule is a statutorily imposed sufficiency review and is not derived from federal or state constitutional principles that define the legal and factual sufficiency standards."  *Qualls v. State*, 547 S.W.3d 663, 671 (Tex. App.—Fort Worth 2018, pet. ref'd) (citing *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007)).

"When evaluating the sufficiency of corroboration evidence under the accomplice-witness rule, we 'eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime.'"  *Id.* (quoting *Solomon v. State*, 49 S.W.3d 356, 361 (Tex.

---

[4]As stated, Cotton's point could be construed as a sufficiency challenge contingent on the exclusion of the accomplice testimony ("The evidence, other than that of the two accomplices, is insufficient to connect Appellant to the offense.").  However, Cotton briefed this as a question of the accomplice-witness rule.  Cotton did not provide a discussion of the sufficiency standard of review, nor did Cotton provide a discussion of the nonaccomplice testimony in light of that standard.  In any event, we find that the accomplice testimony was corroborated and, therefore, do not reach the contingent of analyzing the sufficiency of the evidence without uncorroborated-accomplice testimony.

11

Crim. App. 2001)). "The sufficiency of nonaccomplice evidence is judged according to the facts and circumstances of each case." *Id.* (citing *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011)). "We do not independently construe the nonaccomplice evidence but instead defer to the fact[-]finder's resolution of it." *Id.* (citing *Smith*, 332 S.W.3d at 442).

"To meet the rule's requirements, the corroborating evidence need not prove the defendant's guilt beyond a reasonable doubt by itself." *Id.* (citing *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008)). "Nor is it necessary for the corroborating evidence to directly link the accused to the commission of the offense." *Id.* (citing *State v. Ambrose*, 487 S.W.3d 587, 593 (Tex. Crim. App. 2016)). "Rather, the evidence, whether direct, circumstantial, or both, must show that rational jurors could have found that it sufficiently tended to connect the accused to the offense." *Id.* (citing *Smith*, 332 S.W.3d at 442). "Additionally, circumstances that are apparently insignificant may nevertheless constitute sufficient evidence of corroboration." *Id.* (citing *Trevino v. State*, 991 S.W.2d 849, 852 (Tex. Crim. App. 1999)). "Finally, an accomplice's out-of-court statement may not be used as corroboration, *Smith*, 332 S.W.3d at 439, but it is also not evidence requiring corroboration under Article 38.14, *Bingham v. State*, 913 S.W.2d 208, 209 (Tex. Crim. App. 1995) (op. on reh'g)." *Id.*

Abeyta and Durham were both charged as accomplices to the murder, and both testified at trial. Under the accomplice-witness rule, we exclude their trial testimony and then examine the remaining portions of the record for evidence that tends to connect Cotton to the murder, though we give deference to the jury's resolution of the evidence. *See id.*

12

Sones's timeline, and his testimony, was a significant part of the evidence that tended to connect Cotton with the offense of murder. As stated above, Sones's timeline summarized various social media records, phone records, and Cash App transactions. Removing all evidence originating from Abeyta and Durham,[5] Sones's timeline established that

- Braylin reached out to Cotton in December 2021 to confirm whether he had a gun; a week before the murder, Braylin sought Cotton's help for a "play"; and two days later, Braylin suggested Cotton could kill Kevin outside Kevin's front door.

- Two days before the murder, Cotton let Braylin know that he was "ready."

- That same day, Braylin learned Cotton needed ammunition, reached out to Cotton to find out what type, and asked Abeyta to purchase it. Later that day, Cotton messaged another party that he was about to meet someone to get bullets.

- On the day before the shooting, Braylin indicated that he knew the ammunition had been given to Cotton. Cotton later messaged Durham, "Let's go by that one house." Braylin conveyed to Cotton that Kevin would be home during the daytime and that he should "just be over there . . . watching." Cotton responded seeking reassurance that Braylin "ha[d] his back," Cotton told Braylin that he had his back, and Braylin responded, "tell [Cotton] I got him [for sure]." Cotton responded, "1000% long as he got me i got him 1000%."

- Less than one minute before the shooting, Abeyta, Braylin, and Kevin were on a three-way call, after which Kevin left his front door and walked to his mailbox. While at his mailbox, Kevin called Abeyta back. Abeyta attempted to call Cotton immediately after the shooting, but his phone was off. Abeyta tried Cotton again about nine minutes later, but his phone was still off. About nine minutes after Abeyta's second attempt, Cotton called Abeyta, and Abeyta then established a three-way call between herself, Cotton, and Braylin.

---

[5]The accomplice-witness rule requires only that we disregard the accomplice testimony. *Qualls*, 547 S.W.3d at 671. However, we may not rely upon an accomplice's out-of-court statement for corroboration, *id.*, so we remove all social-media evidence that originated with Abeyta and Durham from our consideration of the timeline for purposes of determining whether the evidence tends to connect Cotton to the murder.

Along with the timeline, the jury heard, without objection, Sones's conclusion that "Brown planned and orchestrated and organized the murder of his own father" with Cotton acting as the executioner.

In addition to Sones's testimony, the jury saw a number of surveillance videos. The videos and a crime-scene witness statement allowed for identification of Durham's Chrysler vehicle as the vehicle used in the shooting. The videos showed the Chrysler arriving in the neighborhood and lying in wait around the corner from Kevin's home, with a straight view of his front door, for twelve minutes. The videos provided an unobstructed view of Kevin's shooting by a passenger in the Chrysler as Kevin talked on his cell phone after walking from his front door to his mailbox—in accordance with the plan Braylin suggested to Cotton via tablet message and while Kevin was on a series of calls to and from Abeyta. Sones testified that it was a perfectly timed hit and that it was very clear the Chrysler was waiting for Kevin to walk to his mailbox.

Daniel Koplin, a detective with the FWPD, connected Cotton to the Chrysler because he investigated Cotton's being shot while driving Durham's Chrysler three months before Kevin was killed.

Additional nonaccomplice evidence was presented to the jury, as follows:

- Cotton lived in the Maxwell Apartment that was the subject of the search warrant, as established by unobjected-to testimony from Sones.

- Cotton's valid driver's license and another identification were found in the dresser of the master bedroom of Cotton's apartment.

- Cotton was in his apartment when the search warrant was served.

14

- Cotton had a friendly connection to Braylin, as shown by letters from Cotton addressed to Braylin found in Cotton's apartment.

- Bullet fragments collected at the murder scene were from the .22-caliber family of ammunition, which includes .223 ammunition.

- A gun capable of firing .223 ammunition was retrieved from the hall closet of Cotton's apartment.

- The gun retrieved from the hall closet had a .223 round in the chamber.

- A magazine containing .223 rounds was retrieved from the hall closet.

- A bullet fragment retrieved from the murder scene could not be ruled out as being fired from the type of gun found in Cotton's apartment.

- Several gun accessories were found in the closet in Cotton's master bedroom along with men's shoes and men's clothing.

- The gun retrieved from the closet could not be eliminated as the murder weapon.

Viewing the nonaccomplice evidence, we hold that a rational jury could have found that the evidence sufficiently tended to connect Cotton to the murder offense with which he was charged. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14; *Qualls*, 547 S.W.3d at 672. We, therefore, hold that the testimony of accomplices Abeyta and Durham was sufficiently corroborated and properly considered by the jury.

We overrule Cotton's accomplice-witness point of error.

## IV. Conclusion

We affirm the trial court's judgment.

Jeff Rambin
Justice

Date Submitted: February 12, 2025
Date Decided: March 5, 2025

Do Not Publish

16