

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-24-00166-CR

ANDREK JAKHOB WILLIAMS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 71st District Court
Harrison County, Texas
Trial Court No. 23-0211X

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice van Cleef

MEMORANDUM OPINION

A Harrison County jury convicted Andrek Jakhob Williams of the murder of Jerrold Maze and assessed a sentence of fifty-five years' imprisonment. *See* TEX. PENAL CODE ANN. § 19.02 (Supp.). On appeal, Williams argues that the trial court erred by admitting (1) evidence of his alleged gang affiliation, (2) rap songs about Maze's murder, (3) testimony from untimely disclosed expert witnesses, and (4) testimony of his co-defendant's former cellmate. Because we find that the trial court did not abuse its discretion by admitting the evidence, we affirm the trial court's judgment.

## I.      Factual Background

James Leming, a sergeant with the Marshall Police Department (MPD), testified that Williams's cousin, Akeivyon McMillan, was murdered at the Powder Mill Cemetery on March 30, 2022. Caleb Caldwell, an officer with the MPD, testified that McMillan, who had affiliations with a local gang, "had gone to the cemetery with some people -- who were associated now with [a rival gang], and they executed [him]." The evidence shows that McMillan and Williams, who went by the street name "400," had a close relationship. Accordingly, the State's theory at trial was that Williams murdered Maze on April 4, 2022, in retaliation for McMillan's murder.

Leming explained that, while he was unsure of McMillan's official gang membership, McMillian "had affiliations with individuals who were members of Murda [g]ang, and those individuals also are associated with a group called YGK, which is a Young Gorilla Cartel." Leming testified that the rivals of the Murda gang and YGK were "GBG," also known as the

"Ghetto Boy Gang," and the Five Star gang. Leming's testimony was mirrored by Caldwell, who testified,

> On one side, you've got Five Star, GBG, which is two different sets, but they are on the same side.
>
> And you've also got YGK, SRT, and Murda gang. [Y]GK and SRT are kind of the same thing, and then Murda gang, they're all on the same side. They're associated with each other. They're friendly.

According to Caldwell, McMillan was associated with the Murda gang, Williams was an associate of both "YGK and Murda gang," and Maze associated with members of the GBG and Five Star, who were suspected of McMillan's execution. Caldwell agreed with the State's theory and believed that Maze's murder was in retaliation for McMillan's murder.

Christopher Kozekwa, a gang investigator with the Hearne Police Department, testified that he was familiar with the 400 gang, a "Crip set" who represented their gang by wearing blue. Kozekwa classified Williams as a gang member based on social media photos of him with known 400 members. Kozekwa said Williams was wearing blue and identified himself as a gang member on social media by representing, "I Bang 400." Kozekwa noted that Williams had an "S4L" tattoo on his neck, which was the same tattoo worn by a known member of 400. Kozekwa testified that law enforcement identified Williams as a gang member in police databases, but not until after Maze's murder.

To establish Williams's motive for the murder, the State introduced a social media post from Williams on March 31, following McMillan's murder. On that date, Williams posted, "All y'all get y'all's straps nd then get sum drops nd slide when the time right we gone slide to we can all slide together tho Imma turn you up tho you gone see the news soon." According to

3

Leming, on the morning of Maze's murder, Tyzavier Jones texted Williams that he saw Maze in traffic driving a black car. Williams responded by texting "Cet."

Maze's girlfriend, Alexus Stafford, was with Maze on the day of the murder. Stafford testified that, on that morning, she had taken Maze's car to work and that he was driving her black Chrysler. After work, Stafford met Maze at his mother's house at 607 Holland Street, where they chatted until they decided to go to the gas station for rations. Stafford drove her car 0.4 miles from Maze's mother's house to the Blue Diamond gas station. According to Stafford, when she parked her car, a black Nissan "car pulled beside [them]." She testified, "I hesitated to open my door because they pulled like right beside us." Even so, she left her vehicle with Maze in the passenger seat, walked into the gas station to purchase a Gatorade and a pack of cigars, and returned. When she entered the driver's seat, Maze asked her if she knew the car that had pulled so close to them, but she confirmed that she did not. Stafford testified that Maze told her that "[t]hey just did something weird" and that the driver, who was wearing a mask, had let his window down to look at Maze.

Stafford drove back to Maze's mother's house. She testified, "[T]hat same car that just was at the [gas station] . . . was like waiting for us." According to Stafford, Maze told her to pull up to the house, and the car drove past them. Maze called his brother and cousin, but they did not answer. Stafford said that, while they were in the car, someone started firing shots into the passenger window. Stafford immediately ducked under the steering wheel to escape the bullets, but she saw that Maze had been shot and was bleeding out. Stafford testified that she could not identify the shooter and did not know if there was more than one shooter. Maze's brother,

4

Gregory Worth, arrived and drove Maze to the hospital with Stafford in tow. Stafford called 9-1-1.

Rhonda George, a dispatcher with the MPD, testified that she received the emergency phone call coming from 607 Holland Street. Heath Holt, an officer with the MPD, testified that he was dispatched to the scene at 9:24 p.m. upon arrival, began walking toward the scene, and located eleven spent nine-millimeter shell casings within the driveway and the adjacent grass, as well as several bullet fragments. Glen Stone, a lieutenant with the MPD, testified that he was dispatched to the hospital around 9:25 p.m. to meet Stafford and Maze. Stone said, and photos shown to the jury proved, that there were multiple bullet holes and windows shot out on the passenger side of Stafford's vehicle.

Maze was pronounced dead at the hospital. Dr. Feng Li, a forensic pathologist and senior medical examiner, conducted the autopsy of twenty-year-old Maze and testified that he had sustained five gunshot wounds, including two fatal ones to the head.

Leming's investigation started with Stafford's statements, which showed that surveillance footage from the gas station would likely be helpful. Brian McIntosh, a sergeant with the MPD, testified that he obtained for Leming surveillance footage from the Blue Diamond gas station. According to McIntosh, Stafford's black Chrysler pulled into the gas station at 9:10 p.m. As shown on the surveillance footage, the driver of the suspect vehicle, a black Nissan Sentra, pulled into the gas station one minute later, rolled the window down halfway, looked at Stafford's vehicle, rolled the window back up, and drove away from the gas station in a direction that was toward 607 Holland. The jury saw that the driver was wearing a mask from the nose

5

down when he rolled his window down to look at Maze. McIntosh also obtained surveillance footage from the camera at Maze's mother's house, as well as neighboring households. Those recordings, played for the jury, show Stafford turning into the driveway and "the suspect vehicle driv[ing] by." The recordings also captured "the flash consistent with gunshots being fired," as well as "two faint figures" passing by after the murder. According to Leming, the surveillance recordings corroborated Stafford's account of Maze's murder.

Leming testified that he obtained a search warrant for the suspect vehicle. According to Leming, a black Nissan Sentra, which was owned by Kyiara Hayward, was abandoned at FM 1999. Leming noticed that the abandoned vehicle had distinct markings and other similarities with the suspect vehicle that was seen on surveillance footage. When the Nissan was searched, officers found a receipt for ammunition for a nine-millimeter that was purchased from the Great American Pawn Shop on March 31, 2022. Leming noted that the ammunition was bought the day after McMillan's murder and four days before Maze's murder. While Leming could not say whether the bullets purchased at the pawn shop were the same bullets used in Maze's shooting, they were of the same brand. To see who had made the purchase, Leming dispatched McIntosh to collect any surveillance footage from the pawn shop.

McIntosh obtained surveillance recordings from the pawn shop showing the two individuals who purchased bullets on March 31 at 2:11 p.m. The pawn shop recording clearly depicted the faces of both people. Leming personally knew and identified Taylor Johnson as the one accompanying the other suspect in the pawn shop. The recordings from the gas station and

6

the pawn shop were turned into Crimestoppers videos that were released to the public in hopes that someone could identify the other suspect.

Lametra Agers testified that she viewed the Crimestoppers videos and identified Williams as being in both. Agers also testified that she had seen Williams in an Instagram post wearing a mask like the one worn at the gas station. Melissa Jones also testified that she identified Williams on the Crimestoppers pawn shop video. On April 8, Officer Sonya Johnson, with the Marshall Independent School District police, identified Johnson and Williams. As a result, Leming said that multiple people had identified Williams as the main suspect based on the Crimestoppers videos.

With that information in mind, Leming began interviews of the people potentially involved. He interviewed Hayward, who owned the black Nissan and was Williams's cousin. Leming testified that Tyzavier Jones, who also had a black Nissan, Devontay Black, Markell Rudd, and Maurice Rudd came in voluntarily to speak with him and that his interview with Shakeem Jackson, a leader of YGK, led him to Williams. Johnson was cleared as a suspect, leaving MPD with information that Williams and an unknown person were suspects in Maze's shooting. Leming testified, "[W]e were advised multiple times that Mr. Maze's murder was the result of a social media beef, social media conflict." Even so, MPD was not able to locate any relevant social media posts, and a social media search warrant did not yield any results.

Eric Lavigne, who was twenty years old, was in jail, and admitted to shooting someone, was bench warranted for trial. Lavigne testified that Williams was like a brother to him. Even

so, Lavigne provided a statement to MPD about Maze's murder.[1]  Lavigne testified that Williams was living with Ihymad Anderson in St. Louis, Missouri, after the murder, and then moved to Houston with Johnson's cousin, Cameron Peyton.  After Lavigne was released on bond, he absconded and moved in with Williams in Houston.

Lavigne said that he asked Williams about Maze's murder while they were living together.  According to Lavigne, Williams admitted to murdering Maze because Maze was "laughing at [McMillan's murder] on Facebook."  Lavigne noted that Williams and McMillan were cousins and had a close relationship.  Williams told Lavigne that Anderson was with him during the murder and that Maze's death "don't get to him too much."  When asked how it happened, Williams told Lavigne that he was in his cousin's black Nissan when they saw Maze at the Blue Diamond gas station, followed Maze to his mom's house, parked the car in front of the house, and shot Maze from the passenger side of the car.  According to Lavigne, Williams said he used a Glock 17, ordered a new barrel and spring for the gun, and left it at his mother's house.  Lavigne testified that Williams said he wore all black with a black mask, and he remembered shooting Maze in the face and remembered that there was a girl in the car.

Peyton also testified that Williams was like a brother to him and that Williams had a close relationship to McMillan.  According to Peyton, Williams wanted revenge for McMillan because Maze was laughing at McMillan's murder on Facebook.  Peyton testified that Williams said he was driving his cousin's car when he saw Maze at the Blue Diamond gas station, followed Maze to his mother's house, and watched Maze sit in the parked car rolling a blunt.

---

[1]Lavigne recanted his statement to MPD because he did not want to testify but informed the jury that his recantation was false.

8

According to Peyton, Williams admitted that he was involved in the shooting, along with Anderson and Johnson. Peyton said Williams changed the barrel of the gun he used, but the police had confiscated it. When shown a screenshot of the gas station surveillance footage depicting the driver with his window lowered while looking at Maze, Peyton testified that he believed the masked driver was Williams. During cross-examination, Peyton testified that Williams never directly told him that he was the person who had shot Maze.

Payton and Lavigne both testified that they made rap songs with Williams about Maze's murder. Lavigne said that they made eight or twelve rap songs about the murder, although not everything in the rap songs was true. Lavigne also testified that Williams got an S4L tattoo, which meant "Southside [For] Life." Lavigne testified that Williams was a member of the 400 gang while McMillan was a member of Murda gang. Lavigne also said that Williams got four bullet-hole tattoos because he shot Maze four times. Lavigne testified that he recognized Williams in an Instagram photo of him wearing a mask and that his Instagram handle, "Andrekfrm400," was a reference to the 400 gang.

Williams was found and arrested in his apartment in Houston. Anderson was also arrested. The arrests gave MPD access to their electronics. Josh Sims, a detective with the Kilgore Police Department, testified that he used a tool called Graykey, which "essentially runs an algorithm of passwords through the phone" until it unlocks it. Sims testified that he was able to partially "extract" four cellphones given to him by Leming.

Leming testified that, on April 6, an unidentified person with the social media name "Theylovepretty_" messaged Williams to tell him to delete the photo of him wearing the ski

9

mask, and Williams replied, "K." The person also messaged Williams again asking him to delete the photo of him in front of a black Nissan. That person said Williams's name was involved and that she was trying to make sure he was "good." Williams replied that he knew and appreciated the person. Williams later messaged that he hoped Jones would not admit that he was with Williams in the pawn shop.

Leming interviewed Williams, who denied knowing Maze even though social media accounts showed that he knew him. According to Leming, Williams also denied driving the suspect vehicle even though MPD had surveillance footage and text messages from Hayward's account showing that Hayward and Williams had switched vehicles.

Caldwell testified that the cellphones had forty-eight rap songs, including five or six songs that referenced Maze's murder. Caldwell testified that the songs used Maze's street name, Jpooh. Through Caldwell, the State established that, after referencing wearing a mask and "searching for them fellows," one of the songs had lyrics stating, "They slipped at the store. . . . Jpooh ain't no gas, he getting smoked like a skimp, how about that cutter, I'm ducking and busting, I'm full of this dope ducking like blowing. . . . You mess with a nigga, you get popped like Pooh." The song continued, "You know it's lil Pooh that we blow . . . . We finna blitz and hell nah we ain't finna did that, pull up, just shoot right where his head at." The song made references to "body for body." Leming testified that there was a rap video were Williams "made the gun motion" and "sound[ed] like he said [he] did it for [McMillan]." Leming testified that Williams was driving the suspect vehicle in the rap video.

10

Williams's co-defendant, Anderson, invoked his Fifth Amendment right not to testify. His cellmate, Odyessious Chism, testified about statements Anderson made while in jail. Chism, who was known by the nickname Pooh, told Anderson to call him that, but Anderson said he would not use the nickname because he was in jail because of someone with a similar name. According to Chism, Anderson said,

> [T]hey had been sitting around waiting for the guy to come through, whatever. They had got a tip of where he might be, and they sat there and waited, and when they seen him drive by, he had a girl with him . . . he pulled up in the driveway, they ran up on him, and . . . . They shot him.

According to Chism, Anderson said he was with a guy called 400 and that the girl ran, a fact that MPD had not released to the public. Anderson also told Chism that there was a recording of his friends at the pawn shop from a few days before the murder. According to Chism, Anderson did not specifically say who the shooter was.

Williams's defense rested on an alibi, and the fact that Trayvon Stephenson, not Maze, was convicted of McMillan's murder. Williams's younger brothers, B.H.[2] and B.L.H., both testified that their mother was out of town helping McMillan's mother with McMillan's funeral when Maze was killed and that Williams was playing video games with them until late that night. However, during cross-examination, neither B.H. nor B.L.H. were sure if Anderson was watching them on April 4 when Maze was murdered. Williams's mother, A.D.H., testified that someone called McMillan's mother to report Maze's death. A.D.H. said that she immediately tried to call her boys but that no one answered. A.D.H. said she called her sister, who went to A.D.H.'s home and put Williams on the phone.

---

[2]We use initials to protect those that were minors at the time of the offense. *See* TEX. R. APP. P. 9.10.

11

After hearing all of the evidence, the jury rejected Williams's defense and convicted him of murder. By four separate points, Williams questions the trial court's evidentiary rulings.

## II. Standard of Review

"We review a trial court's decision whether to admit or exclude evidence for an abuse of discretion." *Hart v. State*, 688 S.W.3d 883, 891 (Tex. Crim. App. 2024) (citing *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009)); *see Flowers v. State*, 438 S.W.3d 96, 103 (Tex. App.—Texarkana 2014, pet. ref'd). "Abuse of discretion occurs only if the decision is 'so clearly wrong as to lie outside the zone within which reasonable people might disagree.'" *Flowers*, 438 S.W.3d at 103 (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008) (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g))). "We may not substitute our own decision for that of the trial court." *Id.* (citing *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)). "We will uphold an evidentiary ruling if it was correct on any theory of law applicable to the case." *Id.* (citing *De La Paz*, 279 S.W.3d at 344).

## III. Allowing Gang Affiliation Evidence Was Not an Abuse of Discretion

In his first point of error on appeal, Williams argues that evidence of his alleged gang affiliation was irrelevant and, in the alternative, that its probative value was significantly outweighed by the danger of unfair prejudice. Williams also argues that testimony about gang affiliation constituted improper character evidence because the State was unable to prove a gang-related motive for the murder. Yet, when applying the standard of review, we find no abuse of discretion in the trial court's decision that evidence of Williams's gang affiliation was relevant to

12

the issue of motive, that its probative value was not substantially outweighed by the danger of unfair prejudice, and that admission of such evidence was allowed as an exception to the character evidence rule.

"Evidence is relevant if . . . it has any tendency to make a fact" of consequence "more or less probable than it would be without the evidence." TEX. R. EVID. 401. "The threshold for relevance under Rule 401 is very low," *Haley v. State*, 173 S.W.3d 510, 520 (Tex. Crim. App. 2005) (Keller, P.J., concurring), and the evidence "need not prove the point by itself," *Beham v. State*, 559 S.W.3d 474, 482 (Tex. Crim. App. 2018). The Texas Court of Criminal Appeals has written that "gang-affiliation is relevant to show a motive for a gang-related crime." *Vasquez v. State*, 67 S.W.3d 229, 239 (Tex. Crim. App. 2002). Here, the State posited that McMillan was a gang member and Williams, who associated with members from McMillan's gang, wanted revenge for his killing by a rival gang. As a result, the evidence related to Williams's gang associations and affiliations were relevant to establishing the State's theory that Williams sought revenge for the gang-related murder of McMillan.

Next, under Rule 403 of the Texas Rules of Evidence, a trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." TEX. R. EVID. 403. Williams argues that it "was never proven that [Maze] was a gang member," and as a result, it was unnecessary for the State to prove that Williams affiliated with gang members. However, Caldwell testified that Maze associated with members of GBG and Five Star. For the State to show that Williams's motive was gang-related retaliation, the State sought to prove that Williams had affiliations with gang members who opposed GBG and Five Star.

13

Even so, Williams argues that gang affiliation is highly inflammatory. While there is no doubt that evidence of gang affiliation "is 'prejudicial'—it must be *unfairly* prejudicial" to be excluded. *Vasquez*, 67 S.W.3d at 240. "Unfair prejudice occurs when the evidence has 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Id.* (quoting *Rogers v. State*, 991 S.W.2d 263, 266 (Tex. Crim. App. 1999)). Here, as in *Vasquez*, "[t]he potential improper basis would be the use of gang affiliation to show that appellant was a bad person and that he acted in conformity with his bad character." *Id.* Yet, when gang affiliation is used to establish motive for murder, a trial court does "not err in finding that th[e] potential character conformity inference does not substantially outweigh the relevant purpose of showing motive." *Id.*; *see Williams v. State*, 974 S.W.2d 324, 331 (Tex. App.—San Antonio 1998, pet. ref'd) (admitting gang-affiliation evidence over Rule 403 objection where evidence was relevant to show a non-character purpose under Rule 404); *Barrientos v. State*, 539 S.W.3d 482, 492–93 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *see also Salinas v. State*, No. 04-07-00492-CR, 2008 WL 4163203, at *2–3 (Tex. App.—San Antonio Sept. 10, 2008, pet. ref'd) (mem. op., not designated for publication). Accordingly, we cannot say that the trial court abused its discretion in conducting its Rule 403 balancing test and ruling in favor of admission.

While it is true that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait," the State did not seek to establish that Williams had bad character because he affiliated with gangs and, as a result, must have committed the murder in accordance with his character. TEX.

14

R. Evid. 404(a)(1).[3] This is because "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Tex. R. Evid. 404(b)(1). But "[g]ang membership evidence is admissible under Texas Rule of Evidence 404(b) if it is relevant to show a non-character purpose that in turn tends to show commission of the crime." *Tibbs v. State*, 125 S.W.3d 84, 89 (Tex. App.—Houston [14th Dist.] 2003, pets. ref'd) (citing *Vasquez*, 67 S.W.3d at 239–40). Here, the State wanted to show that Williams's gang affiliations provided the motive for a retaliatory killing of a rival gang affiliate. *See* Tex. R. Evid. 404(b)(2) (evidence of a crime, wrong, or other act "may be admissible for another purpose, such as proving motive"). Because "[g]ang membership may be admissible to show . . . motive," we cannot say that the trial court acted outside the zone of reasonable disagreement in admitting the evidence as an exception to the character evidence rule that met the requirements of Rule 404(b)(2). *Tibbs*, 125 S.W.3d 89 (citing *United States v. Sargent*, 98 F.3d 325, 328 (7th Cir. 1996); *Stern v. State*, 922 S.W.2d 282, 287 (Tex. App.—Fort Worth 1996, pet. ref'd)).

Because the trial court's decision to allow evidence of gang affiliation to show Williams's motive was not an abuse of discretion, we overrule Williams's first point of error.

## III. The Trial Court Did Not Abuse Its Discretion by Allowing the Rap Songs

In his second point of error, Williams argues that the trial court erred by admitting certain rap songs over his Rule 403 objection. Initially, we address the threshold question of preservation of error. To raise a complaint on appeal, the record must show that the appellant

---

[3]The trial court properly instructed the jury that it could "not consider this evidence to prove that the defendant is a bad person and for this reason was likely to commit the charged offense."

15

raised the same complaint at trial and either received an adverse ruling or objected to a trial court's refusal to rule. *See* TEX. R. APP. P. 33.1(a).[4]

Before the State's opening statement, Williams objected to the "rap lyrics [the State] plan[ned] on offering." Williams said, "Judge, you've seen the case law. If they can't establish those rap lyrics truly affect the guilt/innocence of this case more than just my client rapping about shooting guns or other derogatory things that it would probably result in a new trial here." The trial court made a conditional ruling when it said the following:

> THE COURT: Well, -- and I -- I mean, the Court is aware of the case.
>
> . . . I indicated I was going to allow [the State] to go into opening. You understand that if -- if there's not any testimony with regard to -- that that was directly related to the alleged offense in this case, I will immediately order a mistrial . . . if there's not a connection. I need to make sure there's not -- I don't want to hear any argument about, [w]ell, we thought that that was going to be the case, but, I mean, if it's directly related, then it comes in.

The State agreed and said it would prove the direct relationship.

At trial, Williams objected to evidence of Sims's extraction of the cell phones on the ground that unspecified items found on the extraction were "highly prejudicial." The evidence shows that the extraction yielded a voluminous four terabytes of information, including many photos, texts, and rap videos.[5] But, by that time, the State had called witnesses to show the direct relationship between Maze's murder and the rap songs. As a result, Williams said,

---

[4]Williams's arguments on appeal are more expansive when compared to his arguments at trial. We limit our analysis to the issues and arguments raised before the trial court. *See* TEX. R. APP. P. 33.1.

[5]Williams objected to a voluminous exhibit. "When an exhibit contains both admissible and inadmissible evidence, the burden is on the objecting party to specifically point out which portion is inadmissible." *Kelso v. State*, 562 S.W.3d 120, 136 (Tex. App.—Texarkana 2018, pet. ref'd) (citing *Whitaker v. State*, 286 S.W.3d 355, 369 (Tex.

> I also assume the Court will let in the rap songs, but to assist the jury in one as far as being able to not have to go through an entire terabyte, if they want to review something, if they could extract what they particularly want, ultimately I think that would not only alleviate my ultimate objection, but it would probably also assist the jury.

After the State announced that "[it] was not planning on showing anything but the rap songs in there," Williams simply responded, "Okay." Later, while Williams did object to the State playing two raps songs that Williams did not participate in, the State decided to "just play the ones with [Williams] on it." Accordingly, as to the rap videos with Williams in them, Williams did not obtain any definitive ruling on his objection.[6] Thus, Williams appeared to have abandoned his prior complaint with respect to the rap songs he sang or rap videos he was in and did not object when the audio or video from those rap songs was played or when Caldwell testified about their lyrics.

Even so, the record shows that the State played a rap song about Maze's murder that did not include Williams. Accordingly, we address the merits of this complaint.

Williams argued that the rap songs without him were unfairly prejudicial, triggering Rule 403. Under that rule, otherwise relevant evidence can be excluded "when the costs of admission outweigh its utility." *Hart*, 688 S.W.3d at 891. Williams's argument relies on the Texas Court of Criminal Appeals's opinion in *Hart*, which said, "[I]t is not reasonable to assume that all lyrics are autobiographical as to past or future conduct, unless there is direct evidence to suggest

---

Crim. App. 2009)). "A trial court is not obligated to search through an exhibit and segregate the admissible evidence from the inadmissible." *Id.* "Instead, 'the trial court may safely admit it or exclude it all, and the losing party, no matter who he is, will be made to suffer on appeal the consequences of his insufficiently specific offer or objection.'" *Id.* (quoting *Richter v. State*, 482 S.W.3d 288, 298 (Tex. App.—Texarkana 2015, no pet.)).

[6]When the State played the rap videos depicting Williams, Williams objected to their admission on grounds of authentication, but he does not raise that issue on appeal.

otherwise." *Id.* at 894–95. For this reason, "[r]egardless of the genre, inflammatory lyrics create the potential that the jury could ascribe character assessments to the defendant based on the content of the music he listened to or lyrics he wrote." *Id.* at 896. The Texas Court of Criminal Appeals noticed that "we don't convict people for murder simply because they have written lyrics about murder." *Id.* (quoting *United States v. Stuckey*, 253 F.App'x 468, 483 (6th Cir. 2007)). As a result, in *Hart*, a case where "the State did not offer anything demonstrating that the lyrics and video were somehow representative of Appellant's character in that they applied outside of the artistic rendering" and failed to demonstrate that that rap song "was relevant to the charged offense," the Texas Court of Criminal Appeals determined that the rap songs should have been excluded. *Id.*

A review of the facts of this case show that *Hart* is inapposite. The Texas Court of Criminal Appeals further stated,

> To determine whether evidence is admissible under Rule 403, Texas appellate courts will use the [following] *Montgomery* factors[:] (1) the strength of the evidence's probative value, (2) the potential for the evidence to "impress the jury in some irrational but nevertheless indelible way," (3) [t]he amount of time required at trial to develop the evidence, and (4) the proponent's need for the evidence.

*Id.* at 891 (quoting *Montgomery*, 810 S.W.2d at 389–90). Here, Lavigne and Peyton had both testified that they participated with Williams in creating rap songs and rap videos about Maze's murder. Because the State introduced testimony showing that the rap songs without Williams were about Maze's murder and came from Williams's phone, they were highly probative of Williams's motive and involvement. Although the rap songs contained prejudicial depictions of criminal and gang activity, the trial court was free to find that the probative value of the rap was

18

not substantially outweighed by unfair prejudice because the State had established a gang-related motive to Maze's murder and had played rap videos for the jury showing Williams after he had abandoned his objection to them. In other words, the trial court could find that there was nothing unduly prejudicial about the rap songs he did not participate in. The amount of time needed to play the rap songs was negligible since it took only a matter of minutes during the four-day trial, and the State's need for the evidence was high since there were no eyewitnesses to the murder that could clearly identify the shooter or shooters, and the State needed to rebut Williams's alibi. As a result, we conclude that the trial court did not abuse its discretion in admitting the rap songs over the objections that Williams did preserve. Consequently, we overrule Williams's third point of error.

**IV.    The Trial Court Did Not Abuse Its Discretion in Admitting Expert Testimony**

Next, Williams argues that the trial court erred by admitting expert testimony from two experts, Sims and Caldwell, who were untimely disclosed. We disagree.

On September 6, 2024, the State filed a motion for continuance on the ground that, "[o]n the evening of September 4th, [t]he State was informed that four out of the seven phones previously collected as evidence were successfully extracted." On September 9, 2024, the trial court heard the State's motion for continuance. The State explained that it was previously told that phone "extractions would be unlikely because there were no passwords," but received word on September 4 that new software was able to access four of the phones. The State represented, and Williams acknowledged, that the State had shared the extraction with Williams.

19

Williams noted that the extraction included "a couple videos or lyrics that the district attorney's office believes implicates [Williams] in this crime." Although Williams voiced opposition to the State's continuance, the trial court granted the State a two-week continuance that allowed Williams some time to review the new evidence.

At the same hearing, the trial court heard and overruled Williams's objection to expert testimony. By August 19, the State had already designated Caldwell as a potential expert witness. At the September 9 hearing, the prosecutor said, "I'm going to file the expert motion today, but we will be within the expert time frame if it does go [to trial] on the 23rd." Williams objected to untimely disclosure of the experts, Sims and Caldwell, but the trial court overruled Williams's objection. The State then filed an application for subpoenas listing Sims and Caldwell, but they were listed as witnesses, not experts.

At trial, Williams objected "to Detective Sims offering what would be detailed expert testimony as a forensic expert in computers because he was not timely designated." The trial court overruled that objection after noting that "[it] took this issue up before, and [it] overruled based on the continuance." The trial court also overruled Williams's objection to Caldwell because although designated as an expert without any indication of the area of his expertise, he was not specifically designated as a gang expert.

20

A party receiving a request for disclosure

> shall disclose to the requesting party the name and address of each person the
> disclosing party may use at trial to present evidence under Rules 702, 703, and
> 705, Texas Rules of Evidence. Except as otherwise provided by this subsection,
> the disclosure must be made in writing in hard copy form or by electronic means
> not later than the 20th day before the date that jury selection in the trial is
> scheduled to begin.

TEX. CODE CRIM. PROC. ANN. art. 39.14(b) (Supp.).

Here, because Caldwell was properly designated by the requirements of Article 39.14 as an expert witness on August 19, we find that the trial court properly overruled Williams's objection. As for Sims, the State's failure to timely identify him did not result in automatic exclusion. *See Hardin v. State*, 20 S.W.3d 84, 88 (Tex. App.—Texarkana 2000, pet. ref'd).[7] Instead, the trial court has discretion to allow an undisclosed witness to testify after considering any "showing of bad faith on the part of the prosecutor" and "whether the defendant can reasonably anticipate that the witness would testify." *Nobles v. State*, 843 S.W.3d 503, 514–15 (Tex. Crim. App. 1992) (quoting *Hightower v. State*, 629 S.W.2d 920, 925 (Tex. Crim. App. [Panel Op.] 1981)). Williams admits that there was no showing of bad faith on the State's part. Further, the trial court was free to find that Williams knew that Sims would be called to testify based on the State's representation at the hearing that it was going to disclose its experts and the September 9 notice adding Sims as a witness.

Moreover, even had we found the admission of Sims's testimony to be error, nothing suggests that it was harmful. Sims only testified that he was able to partially extract four phones,

---

[7]The Texas Court of Criminal Appeals has stated that a continuance is an appropriate solution for a State's untimely disclosure. *State v. Heath*, 696 S.W.3d 677, 707–08 (Tex. Crim. App. 2024).

and the contents of the extraction were not published through Sims. Instead, the contents of the extraction were introduced through Leming and Caldwell. Leming also testified, without objection, that MPD had obtained search warrants to extract the phones and that Sims had accomplished the task. "If the same or similar evidence is admitted without objection at another point during the trial, improper admission of the evidence will not constitute reversible error." *Josey v. State*, 97 S.W.3d 687, 698 (Tex. App.—Texarkana 2003, no pet.); *see Davis v. State*, 614 S.W.3d 223, 229 (Tex. App.—Texarkana 2020, no pet.) (citing *Lane v. State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004)). "This rule applies whether the same evidence was admitted 'without objection . . . before or after the complained-of ruling.'" *Davis*, 614 S.W.3d at 229 (quoting *Lane*, 151 S.W.3d at 193).

We overrule Williams's third point of error.[8]

## V. The Trial Court Did Not Err by Admitting Co-Conspirator's Cellmate's Testimony

In his last point of error, Williams argues that the trial court erred by admitting Chism's jailhouse testimony because it was hearsay. The State argues that Chism's testimony was not hearsay because it constituted a statement against interest. We agree.

A statement against interest is "not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness." TEX. R. EVID. 803. To qualify as a statement against interest, the statement must be such that

---

[8]Williams also objected to Caldwell's testimony because, although he was designated as an expert, he was not designated as a gang expert. Even so, the objection came after Caldwell had already testified about Five Star and GBG on one side and YGK, SRT, and Murda gang on the other side. As a result, the trial court could have determined that Williams's objection was untimely, and we will not disturb that ruling since it was not made "at the earliest possible opportunity." *Davison v. State*, 602 S.W.3d 625, 648 (Tex. App.—Texarkana 2020, pet. ref'd) (quoting *Martinez v. State*, 867 S.W.2d 30, 35 (Tex. Crim. App. 1993)).

(A)     a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability or to make the declarant an object of hatred, ridicule, or disgrace; and

(B)     is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

TEX. R. EVID. 803(24).  "The rationale behind admitting these types of statements 'stems from the commonsense notion that people ordinarily do not say things that are damaging to themselves unless they believe they are true.'" *Williams v. State*, 606 S.W.3d 48, 59 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd) (quoting *Walter v. State*, 267 S.W.3d 883, 890 (Tex. Crim. App. 2008)).  "[A] reasonable person would not normally claim that he committed a crime, unless it were true." *Id.* (alteration in original) (quoting *Walter*, 267 S.W.3d at 890).

"Rule 803(24) sets out a two-step foundation requirement for admissibility of hearsay statements." *Id.*  "First, the trial court must determine whether the statement subjects the declarant to criminal liability and whether the declarant realized this when he made the statement." *Id.* (citing *Walter*, 267 S.W.3d at 890–91).  "Second, the trial court must then determine whether sufficient corroborating circumstances exist that clearly indicate the trustworthiness of the statement." *Id.* (citing *Walter*, 267 S.W.3d at 891).

As for the first part of the test, Chism testified that Anderson said he was with a man called 400, that "[t]hey had got a tip of where [Maze] might be," that "they sat there and waited," and that they saw Maze with a girl.  According to Chism, Anderson continued by saying that "they ran up on [Maze]" in the driveway and "they shot him."  Anderson's statements were

23

"blame-sharing" since they implicated both Anderson and Williams equally. *Id.* Accordingly, as the fact-finder, the trial court could find that a reasonable person in Anderson's position would not have made the statements unless they were true because they show that Anderson was a party to the murder. The trial court could also have found that Anderson knew the statement was against his penal interest at the time it was made because Anderson was explaining to Chism the reason for his incarceration when he admitted to participating in a murder. *See id.* at 60.

Next, Anderson's statements to Chism were made after they had both been in the same cell together and had started developing a friendship. *See id.* Anderson's statements to Chism were consistent with the details of the murder presented through the State's other witnesses. Further, Chism testified that Anderson revealed that Maze was with a girl who ran, and that detail had not been revealed to the public. As a result, the trial court could have found that independent corroborative evidence verified Anderson's statements to Chism. *See id.*

Because the trial court did not abuse its discretion by finding that Anderson's statements to Chism were statements against interest, it did not err in overruling Williams's hearsay objection. As a result, we overrule Williams's last point of error.

## VI. Conclusion

We affirm the trial court's judgment.

Charles van Cleef
Justice

Date Submitted:     April 28, 2025
Date Decided:      July 3, 2025

Do Not Publish

24