

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-24-00214-CR

---

KENNETH FOSTER, Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 102nd District Court
Bowie County, Texas
Trial Court No. 23F-1220-202

---

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

MEMORANDUM OPINION

A Bowie County jury convicted Kenneth Foster of capital murder and sentenced him to life without parole. *See* TEX. PENAL CODE ANN. § 19.03 (Supp.).

Foster claims the evidence was legally insufficient to support his conviction because "no rational juror could find beyond a reasonable doubt that the State disproved [his] deadly force self-defense and necessity theories." Because we conclude there was sufficient evidence to support the jury's rejection of Foster's defensive theories, we affirm the trial court's judgment.

## I. Applicable Law and Standard of Review

### A. Capital Murder

A person commits the offense of capital murder if the person, "while incarcerated" for capital murder, TEX. PENAL CODE ANN. § 19.03(a)(6)(A), "intentionally or knowingly causes the death of an individual." TEX. PENAL CODE ANN. § 19.02(b)(1) (Supp.).

### B. Justification Defenses

Relevant to Foster's claims, the Texas Penal Code provides for defenses to prosecution when "the conduct in question is justified" under the theories of necessity or self-defense using deadly force. TEX. PENAL CODE ANN. § 9.02; *see* TEX. PENAL CODE ANN. §§ 9.22, 9.31.

A defendant's "[c]onduct is justified" due to necessity if "the actor reasonably believes the conduct is immediately necessary to avoid imminent harm" and "the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct." TEX. PENAL CODE ANN. § 9.22(1)–(2). "[A] necessity defense requires there to be, among other proof, evidence of a

2

specific imminent harm on the occasion in question."[1]  *Daugherty v. State*, No. 06-18-00167-CR, 2019 WL 2195256, at *1 (Tex. App.—Texarkana 2019, pet. ref'd) (mem. op., not designated for publication) (citing *Kelso v. State*, 562 S.W.3d 120, 132–33 (Tex. App.—Texarkana 2018, pet. ref'd)).

"'Imminent' means something that is immediate, something that is going to happen now."  *Kelso v. State*, 562 S.W.3d 120, 132 (Tex. App.—Texarkana 2018, pet. ref'd) (quoting *Murkledove v. State*, 437 S.W.3d 17, 25 (Tex. App.—Fort Worth 2014, pet. dism'd, untimely filed)).  "Harm is imminent when there is an emergency situation and it is 'immediately necessary' to avoid that harm, in other words, when a 'split-second decision' is required without time to consider the law."  *Id.* (quoting *Murkledove*, 427 S.W.3d at 25).  "Imminence 'has two components:  (1) the person making the threat must intend and be prepared to carry out the threat immediately, and (2) the threat must be predicated on the threatened person's failure to commit the charged offense immediately.'"  *Id.* (quoting *Cormier v. State*, 540 S.W.3d 185, 190 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd)).  "Imminent harm must be shown by affirmative

---

[1]We have previously stated that another element of properly raising a confession-and-avoidance defense, particularly necessity, required admitting to commission of the charged offense. *Daugherty*, 2019 WL 2195256, at *1 (quoting *Arnwine v. State*, 20 S.W.3d 155, 158 (Tex. App.—Texarkana 2000, no pet.) (citing *Juarez v. State*, 308 S.W.3d 398, 399 (Tex. Crim. App. 2010); *Dearborn v. State*, 420 S.W.3d 366, 375 (Tex. App.—Houston [14th Dist.] 2014, no pet.))).  "However, that formulation has been rephrased and even seemingly undermined." *Rodriguez v. State*, 629 S.W.3d 229, 231–32 (Tex. Crim. App. 2021) (citing *Juarez*, 308 S.W.3d at 401–02 and comparing *Juarez* with *Gamino v. State*, 537 S.W.3d 507, 512 (Tex. Crim. App. 2017)).  "Admitting to the conduct does not necessarily mean admitting to every element of the offense.  For example, a defendant can '*sufficiently* admit to the commission of the offense' of murder even when denying an intent to kill." *Gamino*, 537 S.W.3d at 512 (quoting *Martinez v. State*, 775 S.W.2d 645, 647 (Tex. Crim. App. 1989)).  Because neither Foster nor the State discussed whether Foster's admission of the offense, or lack thereof, precluded his defenses of necessity and self-defense, we do not address this matter further.

evidence." *Id.* "A threat of harm at some indefinite time in the future is insufficient to satisfy the requirement of imminence." *Id.*

Regarding the justification of self-defense, "Penal Code Section 9.31 provides that, subject to certain exceptions, a person is justified in using force against another 'when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force.'" *Braughton v. State*, 569 S.W.3d 596, 606 (Tex. Crim. App. 2018) (quoting TEX. PENAL CODE ANN. § 9.31(a)). "The use of force is not justified in response to verbal provocation alone, or if the actor provoked the other's use or attempted use of unlawful force." *Id.* (citing TEX. PENAL CODE ANN. § 9.31(b)). And with respect to deadly force, "[a] person is justified in using deadly force against another (1) if he would be justified in using force against the other under section 9.31, and (2) 'when and to the degree the actor reasonably believes the deadly force is immediately necessary: (A) to protect the actor against the other's use or attempted use of unlawful deadly force . . . .'" *Id.* at 606–07 (quoting TEX. PENAL CODE ANN. § 9.32(a)). "A 'reasonable belief' in this context is defined as 'one that would be held by an ordinary and prudent man in the same circumstances as the actor.'" *Id.* at 606 (quoting TEX. PENAL CODE ANN. § 1.07(a)(42)).

### C.      Legal Sufficiency of the Evidence

"The due process guarantee of the Fourteenth Amendment requires that a conviction be supported by legally sufficient evidence." *Id.* at 607. "We assess legal sufficiency by viewing the evidence in the light most favorable to the verdict and asking whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bittick v.*

*State*, 707 S.W.3d 366, 368 (Tex. Crim. App. 2024) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "We compare the trial evidence to 'the elements of the offense as defined by a hypothetically correct jury charge for the case.'" *Id.* at 369 (quoting *Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018)).

"This familiar standard 'recognizes the trier of fact's role as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence.'" *Braughton*, 569 S.W.3d at 608 (quoting *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011)). "On review, this Court determines whether the necessary inferences made by the trier of fact are reasonable, based upon the cumulative force of all the evidence." *Id.* (quoting *Adames*, 353 S.W.3d at 860). "We presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution." *Id.* "As a reviewing court, we may not reevaluate the weight and credibility of the evidence in the record and thereby substitute our own judgment for that of the factfinder." *Id.* "A reviewing court is thus 'required to defer to the jury's credibility and weight determinations.'" *Id.* (quoting *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.)). "However, juries are not permitted to come to conclusions based on 'mere speculation or factually unsupported inferences or presumptions.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007)).

"In reviewing the sufficiency of the evidence, we should look at '"events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act."'" *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021) (quoting *Hooper*, 214 S.W.3d at 13). "Each

5

fact need not point directly and independently to the guilt of a defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Walker v. State*, 594 S.W.3d 330, 335 (Tex. Crim. App. 2020) (citing *Hooper*, 214 S.W.3d at 13). "Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015). Further, we "consider all of the admitted evidence, regardless of whether it was properly admitted." *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020).

### D. Sufficiency Review of Justification Defenses

The Texas Court of Criminal Appeals recently addressed the burdens of proof and the specific manner of conducting sufficiency review in the context of justification defenses, specifically, self-defense: "[I]n a claim of self-defense . . . , the defendant bears the burden to produce evidence supporting the defense, while the State bears the burden of persuasion to disprove the raised issues." *Braughton*, 569 S.W.3d at 608. "The defendant's burden of production requires him to adduce some evidence that would support a rational finding in his favor on the defensive issue." *Id.* "By contrast, the State's burden of persuasion 'is not one that requires the production of evidence; rather it requires only that the State prove its case beyond a

reasonable doubt.'"[2]  *Id.* (quoting *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003)).

The Texas Court of Criminal Appeals stated,

> Thus, "[i]n resolving the sufficiency of the evidence issue, we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt."

*Id.* at 609 (alterations in original) (quoting *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991)).

"[S]elf-defense is an issue of fact to be determined by the jury, and . . . '[a] jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory.'"  *Id.* (second alteration in original) (quoting *Saxton*, 804 S.W.2d at 914).  "Defensive evidence which is merely consistent with the physical evidence at the scene of the alleged offense will not render the State's evidence insufficient since the credibility determination of such evidence is solely within the jury's province and the jury is free to accept or reject the defensive evidence."  *Id.* (quoting *Saxton*, 804 S.W.2d at 914).  "[T]hese principles . . . , in conjunction with the general sufficiency

---

[2]Foster initially correctly states the parties' burdens of proof when a defendant raises self-defense.  However, later Foster raises the State's introduction of Foster's statement to investigators, in which he claimed self-defense, and cites *Pope v. State*, 505 S.W.2d 556, 557 (Tex. Crim. App. 1974), for the proposition that "[w]hen the State introduces an exculpatory statement in a confession of a defendant, it is then bound to disprove it."  This proposition of law had its basis in the common law "voucher rule."  *Janecka v. State*, 937 S.W.2d 456, 460 (Tex. Crim. App. 996) (per curiam) (quoting *Russeau v. State*, 785 S.W.2d 387, 390 (Tex. Crim. App. 1990)).  "The voucher rule required the State to disprove beyond a reasonable doubt all exculpatory assertions in a defendant's confession if the State offered the confession into evidence."  *Hernandez v. State*, 819 S.W.2d 806, 813 (Tex. Crim. App. 1991), *overruled on other grounds by Fuller v. State*, 829 S.W.2d 191 (Tex. Crim. App. 1992).  "[T]he 'voucher rule' was abolished by the Texas Rules of Criminal Evidence, effective in 1986."  *Janecka*, 937 S.W.2d at 460 (quoting *Russeau*, 785 S.W.2d at 390).  "Thus, the doctrinal basis for the [voucher] rule has disappeared, and with it, the rule itself."  *Id.* (citing *Russeau*, 785 S.W.2d at 390; *Hernandez*, 819 S.W.2d at 813).  We thus reject Foster's proposition that the State was bound to disprove any exculpatory statement found in his statement to investigators.

principles described above, . . . provid[e] the proper framework for evaluating a claim of insufficient evidence in this context." *Id.*

Likewise, "[t]he defendant has the initial burden of producing evidence regarding the necessity defense." *Stefanoff v. State*, 78 S.W.3d 496, 500 (Tex. App.—Austin 2002, pet. ref'd) (citing TEX. PENAL CODE ANN. § 2.03(c)); *Moreno v. State*, 586 S.W.3d 472, 491 (Tex. App.—Dallas 2018), *rev'd on other grounds*, 605 S.W.3d 475, 479 n.16 (Tex. Crim. App. 2020). And, because the elements of necessity and the deadly force self-defense overlap, a jury's finding of guilt on capital murder is not only an implicit rejection of the defendant's self-defense theory, but also of necessity. *Chase v. State*, 666 S.W.3d 832, 836 (Tex. App.—Tyler 2023, pet. ref'd).

In reviewing the sufficiency of the evidence of both Foster's self-defense and necessity defenses, we will "determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the self-defense issue [and necessity issue] beyond a reasonable doubt.'" *Braughton*, 569 S.W.3d at 609 (first alteration in original) (quoting *Saxton*, 804 S.W.2d at 914) (regarding self-defense); *see Fountain v. State*, 604 S.W.3d 578, 583 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (regarding self-defense and necessity).

## II.    The Evidence at Trial

Foster was convicted of the offense of capital murder against Anthony Dominguez by stabbing him with "pointed metal" during a time both were incarcerated in the Texas Department of Criminal Justice (TDCJ) Telford Unit—Foster being incarcerated for capital murder. Foster

and Dominguez were housed in the same building within the unit at the time of the offense. On November 6, 2021, at around 12:20 p.m., Foster and Dominguez had a physical altercation involving a weapon in the doorway of Dominguez's cell. Dominguez died within minutes from a puncture wound to the chest.

The correctional officer patrolling the unit (rover) was not on row three at the time of the incident, only inmates were present at the time of the incident, and the State introduced, without objection, two surveillance recordings taken inside the Telford Unit during the timeframe of the incident.

### A. Surveillance Video

Ronald Stafford, an investigator with the TDCJ Office of the Inspector General, testified as to the contents of the surveillance footage after first giving a short orientation of the layout of the portion of the unit in view: the recording, which has no sound, shows a view of one cell block of Building C that is three stories high (each story called a "row"), with four cells on each side of a restroom area.[3] The cells and restrooms on each row line the outer perimeter of two adjacent walls of a rectangular area, and the cells on rows two and three are fronted by a walkway and railing, as those floors are open to the area below. On the second and third rows, there are two adjacent shower only areas in the middle of the two rows of cells, and on the first row, there is a shower and a urinal area in that space for the inmates using the dayroom, which is a central area between the two walls of cells. Foster was housed in cell five on row one, with no

---

[3]Stafford, the proponent of the State's surveillance recording exhibits, explained that State's exhibit 3 contained an entire video of the day of the incident, though there were occasional gaps in the footage due to issues the Telford Unit was having with surveillance at that time. State's exhibit 4 was a "more presentable" series of five-minute video excerpts from exhibit 3 arranged in a PowerPoint format.

cellmate, and Dominguez and Christian Sibly were housed in cell nineteen on row three. A stairwell for inmate use is on the left corner of the two walls of cells on each floor. The dayroom on row one is where inmates spend time watching television or doing other activities.

At the beginning of the recording, which started at approximately 12:15 p.m., a correctional officer was in the dayroom. That officer's job was to monitor inmate behavior and, row by row, allow passage for inmates who wanted in or out of their cells. Shortly thereafter, Foster appeared near the row one shower wearing only shorts, with Sibly by him, speaking to him. The officer left the section, and Foster put on pants, then walked midway into the dayroom and handed a shower bag to inmate Melvin Richardson. Foster appeared to have a towel on his shoulder and a white shirt in his right hand.

Foster then headed toward the stairwell and went up to row three, cell nineteen. Foster had put on his shirt. At that point, "Foster appear[ed] to be speaking with" Dominguez, with "his arms gesturing," and it seemed to be a "heated conversation."

Soon, "everybody in the dayroom is looking in the direction of three C 19 cell," the door was partially opened, "Foster [wa]s in a crouched position[,] and it appear[ed] there[] [was] a struggle occurring." It appeared that Foster was trying to open the door to the cell and Dominguez was trying to close it. "At one point" Foster grabbed the railing with his right arm, possibly attempting to "gain leverage to get the door open," and at one point, the "door kind of shut[] . . . on his arm." Foster's left arm was going "in and out of the cell" through the doorway. Richardson approached Dominguez's cell. Thereafter, "Foster reach[ed] into the left waistband of his clothing and remove[d] something and . . . ma[de] a stabbing-type motion into 19 cell."

10

Foster then "kick[ed] into the cell," "Dominguez f[e]ll over," and Foster "shut the door." The incident between Foster and Dominguez happened at approximately 12:20 p.m.

Foster next appeared in the dayroom, where he approached Sibly, who immediately went to cell nineteen but later returned to the dayroom. Foster then went into the row one shower and appeared to disrobe. Foster later exited the shower and got fully dressed in different clothing. Over the next forty minutes, Foster remained in the dayroom area, going in and out of the row one shower area numerous times and visiting with several inmates, including Sibly, Richardson, and Isaiah Griffin. Several inmates, including Sibly and Griffin, went to Dominguez's cell to check on him during that time.

At around 12:55 p.m., Foster approached his cell and placed his shower bag at the door. At 1:00 p.m., Foster was wearing shorts and waived at the "picket" to open his cell door.[4] After Foster was back inside his cell, Sibly and Richardson were near his cell door speaking with him, and Griffin was nearby. Richardson was later seen exiting the row one shower area and then speaking with Foster.

During an approximately forty-minute span, there was no indication that security staff had been notified of Dominguez's condition. Staff arrived to cell nineteen around 1:06 p.m., just after Foster had returned to his cell. Numerous staff arrived and attempted life-saving measures. Sibly was soon placed in hand restraints and moved to detention, a customary precautionary measure for the cell partner.

---

[4]Stafford testified that a "picket" is an officer who remains in a secure area and monitors the movements of the officer acting as rover. The picket allows inmates to enter or exit their cell doors.

Dominguez was then removed from cell nineteen and moved to the infirmary or emergency room, and staff members were posted at the door of cell nineteen to secure it until the scene could be processed. The inmates were then directed to their cells, and activities on the block were suspended.

## B.     Non-Inmate Testimony

Lorenzo Thompson, a Telford Unit correctional officer, testified that "[p]retty much" all the cell doors at the Telford Unit were rigged by inmates so that they would not close.

Destiny Glover, a Telford Unit correctional officer, had just started working a shift as rover around 1:00 p.m. when the picket officer asked her to check on Dominguez. When she did, she found Dominguez unresponsive and called for help. When the two officers who initially responded to her call arrived, Dominguez was not breathing, nor did he have a pulse.

Michael Pressnell, a major and duty warden for the Telford Unit, met and interviewed Foster and twenty to twenty-five other inmates on the day of the incident. None of those interviews led Pressnell to believe Foster was a victim.

Stafford took photos of Dominguez's injuries. Stafford also took photos of Foster's injuries, which included a skinned knuckle on the middle finger of his right hand and a round abrasion about a quarter of an inch in diameter in the palm of his right hand. Stafford testified those injuries were consistent with making a stabbing motion while holding the metal part of a weapon in the palm of one's hand. Stafford did not find any other injuries on Foster that day, the date of the incident. Stafford interviewed Foster six days later, after Foster agreed to give a statement.

Billie Jackson, a sergeant with the Telford Unit, was one of the first officers to arrive after Glover's call for help. Jackson placed Sibly in restraints and walked him to a secure cell in another

building. Sibly talked with Jackson as they walked, and Sibly gave Jackson the impression that Dominguez had overdosed. Nothing Sibly said made Jackson believe an assault had occurred or Dominguez had been stabbed.

Tenisha Canida, a security correctional officer at the Telford Unit, was assigned to do constant, direct observation of Foster and Sibly on the day after the incident. Foster and Sibly were housed in adjacent cells at that point, and they were talking to each other. Canida heard them talking about what happened the day before, and she said Foster questioned Sibly through her whole shift. Canida thought Foster and Sibly were trying to get their stories straight. Foster also questioned Canida about what she knew. Foster theorized he might have to spend a year in segregation or get charged with manslaughter. Canida thought Foster was trying to figure out how to "manipulate his way out" of the situation. Foster never said Dominguez "had a shank" or that he was attacked by Dominguez. Foster instead told Sibly that he "walked by [Dominguez's] cell because he was going to take a shower," and Dominguez "said something to him," so "he came back and he said something to [Dominguez] and that's what kind of started the chain of events." Foster never mentioned injuries to his elbow or his hand.

John Frachiseur, K-9 handler for TDCJ at the time of the incident, testified he was assigned to look for weapons in building three five days after the incident. In the shower area on row one, Frachiseur found a piece of sharpened metal about eight inches in length behind a piece of soap in the corner of a vent in the shower. The metal shank was admitted into evidence as State's exhibit 29. Amy Manear, a captain for the TDCJ was also searching that day, and she found an item wrapped in plastic with fabric tied around it that was a similar shape as the shank that had been found, assumed to be the weapon handle.

13

Dr. Erin Barnhart, the chief medical examiner for the Galveston County Medical Examiner's Office who performed the autopsy on Dominguez, testified that Dominguez's fatal puncture wound to his chest was consistent with a puncture caused by the shank found in the shower vent.

## C. Inmate Testimony

Inmate Joey Palomo testified that Foster came to his cell to visit his cellmate, "Parlay." Palomo said Dominguez was acting "very erratic" and threatening Foster. Palomo said Foster told Palomo, "[Y]'all get your homeboy in line or I will and y'all are not gonna like it." On the day of the incident, Palomo saw Foster and Dominguez fighting. He later went to check on Dominguez and found him on the ground, "trying to breathe." Palomo thought Dominguez was "playing around," and he left. Palomo returned about fifteen minutes later and found Dominguez unresponsive.

Sibly said Dominguez did drugs and did not sleep for days before the incident. Sibly said Dominguez wanted to leave their cell at his own discretion, and even though Sibly thought that was a bad idea, he helped Dominguez rig their cell door so it would not lock. Sibly said inmates did that so they could get in and out of their cells because the officers did not allow them access as frequently as they were supposed to.

A few days before the incident, Dominguez accused Sibly, Foster, and Richardson of talking about him. Dominguez also allowed his "homeboys" to use his cell phone, and Dominguez thought they had logged into his Cash App and Facebook accounts and told his girlfriend he was gay. Sibly thought those things were not true but were attributable to Dominguez's drug use.

Sibly said he took a knife from Dominguez the day before the incident and gave it to Dominguez's "homeboys." The day of the incident, Dominguez had a weapon made from fingernail clippers.

14

Sibly said Dominguez was fixated on Foster, who was a friend of Sibly's. On the day of the incident, Sibly saw Foster go up to row three and stop in front of Dominguez's cell, like someone had called his name. When Foster returned to the dayroom, Foster told Sibly that Dominguez had stabbed him, and Foster told him to go check on Dominguez. Foster said he never stabbed Dominguez. Dominguez told Foster every day that he "got something" for Foster, which was a direct threat, meaning, "I'm gonna do something to you." Sibly testified that after November 6, he did not see Foster again until about three days before testifying.

Griffin testified that he knew Sibly, Foster, and Dominguez. Griffin called Foster a "good guy." Griffin did not see Dominguez on the day of the incident, and he never saw Dominguez with a weapon. Griffin said Foster never told him he had gotten stabbed.

### D.    Foster's Statement to Investigators[5]

During Stafford's recorded interview with Foster, Foster denied knowing Dominguez but said that he was a friend of Dominguez's cellmate, Sibly. According to Sibly, Dominguez was delusional on drugs and fixated on Foster.

The night before the incident, Sibly took two knives from Dominguez and showed them to Foster. Foster stated that prison-inmate protocol dictates that anyone having an issue with another inmate is to approach his "people" of the same race. Foster went to Dominguez's gang superiors and told them Dominguez was out of line and that they needed to get him back in line. Dominguez's superiors said they would help. Sibly testified that he and Foster gave the two knives to the gang superiors.

---

[5]The State introduced exhibit 24, a recorded interview with Foster, without objection.

The morning of the incident, Sibly told Foster that Dominguez was once again fixated on him. Later, when Foster was going to the shower (on the third row because the third row had the best showers), he heard Dominguez in his cell, calling out to him. Foster asked Dominguez what his problem was. Foster said Dominguez told him he had something for him, which scared Foster. Dominguez then slashed at Foster's arm.

Foster thought Dominguez's cell door was closed, and he did not know it was rigged to stay open. Foster said Dominguez shoved something out the door and hit him on the left elbow. He also received a wound on his right hand during the struggle. They fought for control of the door, and Foster took the weapon from Dominguez and tried to defend himself. Foster said the weapon was similar to an ice pick and was silver-colored metal. They struggled for a couple of minutes. Foster said Dominguez shut Foster's arm in the door, and Foster dropped the weapon into the cell and walked off.

Foster stated that he did not go to Dominguez's cell to instigate a physical confrontation, that he did not have a "conscious game plan" or an intent "to take this guy out," but that he stabbed Dominguez after first being attacked.

Foster said Sibly and Palomo checked on Dominguez after the incident and reported to Foster that he was writhing and faking. Foster showered. After medical help arrived, Foster said he heard someone say Dominguez was alive and breathing. When Stafford told Foster that did not match the medical reports, Foster said maybe someone besides him did something that killed Dominguez.

Foster asked about Dominguez's cause of death and was told that it was one puncture wound to a vital organ. Foster expressed disbelief since the altercation was around a door. Foster soon

16

acknowledged that the weapon found in the first-floor shower was the weapon used during the altercation with Dominguez. Foster said he hid the weapon out of fear.

### III. Legally Sufficient Evidence Supports the Jury's Rejection of Foster's Defensive Issues

Foster's admission that he used a metal shank to stab at Dominguez during an altercation, along with the recording showing Foster walking up to Dominguez's cell, stopping, and making stabbing motions around the door, and Dominguez's resulting death, is sufficient evidence to support the jury's verdict that Foster intentionally or knowingly caused Dominguez's death. Foster does not dispute those elements of his capital-murder conviction, nor does he dispute that he was incarcerated for capital murder at the time of the incident. Rather, Foster argues he was justified in using deadly force in self-defense, or that he acted out of necessity.[6] As stated above, "A person is justified in using deadly force against another" if, among other things, he "reasonably believes the deadly force is immediately necessary" to protect himself "against the other's use or attempted use of unlawful deadly force." TEX. PENAL CODE ANN. § 9.32(a)(2)(A).

Viewed in the light most favorable to the verdict, the evidence shows that Dominguez had been acting erratically and using drugs in the days leading up to the incident, as well as

---

[6]Foster recognizes that we have previously determined that a defendant is not entitled to an instruction on both deadly force self-defense and necessity, because "[a]llowing an instruction on necessity when, as here, the evidence requires an instruction on self-defense using deadly force would undermine the legislative purpose of only allowing deadly force to be used to prevent the immediate threat to one's life or to prevent the commission of specific violent crimes." *Wilson v. State*, No. 06-14-00021-CR, 2014 WL 8332264, at *6 (Tex. App.—Texarkana Nov. 7, 2014, pet. ref'd) (mem. op., not designated for publication); *see Chase v. State*, 666 S.W.3d 832, 835 (Tex. App.—Tyler 2023, pet. ref'd), *cert. denied*, 144 S.Ct. 580 (2024) (collecting cases). Based on this precedent, Foster concludes, "[I]f the evidence is insufficient to disprove Appellant's deadly force self-defense theory, it is additionally insufficient to support its rejection of the necessity theory as the self-defense theory contains the same essential elements of the necessity defense." Assuming without deciding that Foster is correct, we follow his lead in combining our analysis of the sufficiency of the evidence to support the jury's rejection of his deadly force self-defense and necessity defenses.

making verbal threats against Foster. Dominguez's cellmate, Sibly, took some weapons from Dominguez, and Foster approached Dominguez's gang superiors about Dominguez's behavior. Foster told them if they did not resolve the issue, he would. The next day, Foster said he was going to the third floor to shower, but as he went upstairs, he put a shirt on.

Foster said he heard Dominguez call to him, and Sibly said he saw Foster stop at Dominguez's cell. Though Foster said he did not know the cell door would be open, the jury was free to disregard that statement as inconsistent with Thompson's and Sibly's testimony about the common practice of rigging cell doors. *See Jackson*, 443 U.S. at 219 (stating it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts"). The jury could have concluded from this evidence that, under the circumstances, Foster did not reasonably believe that deadly force was immediately necessary to protect himself. *See* TEX. PENAL CODE ANN. § 9.32(a)(2)(A).

Foster argues that he approached Dominguez only after Dominguez called out to him and stabbed Dominguez only after being attacked, but Palomo and Foster both testified that Foster visited Dominguez's gang superiors the night before the incident, and Palomo said Foster told them to take care of Dominguez's behavior, or he would. The jury was free to disregard Foster's self-serving statement that Dominguez attacked him first and instead conclude that Foster, in murdering Dominguez, was simply carrying through with his threat.

The only testimony that Dominguez attacked Foster came from Foster himself and Sibly, his friend. But Sibly also testified that he never spoke to Foster after the date of the incident, and that directly contradicted Canida's testimony that Foster and Sibly spent most of the next day

18

trying to get their stories straight as they were in adjacent cells. The jury was free to disbelieve Sibly and to discount Foster's statement as self-serving.

Foster himself did not report being attacked by Dominguez or any injuries he received as a result until days after the incident. Foster did not mention acting in self-defense or Dominguez having a weapon during his day-long conversation with Sibly, overheard by Canida, the day after the incident. Further, Foster admitted to hiding the weapon he used to stab Dominguez, but only after initially stating he left the weapon in Dominguez's cell after the incident. All of these actions after the incident can be considered as indicia of guilt. *See Gilbert v. State*, 575 S.W.3d 848, 864 (Tex. App.—Texarkana 2019, pet. ref'd).

We conclude the jury's rejection of Foster's justification defenses was supported by the evidence because the jury could have determined Dominguez did not attack Foster, thus Foster did not have a reasonable belief that deadly force was "immediately necessary" to protect himself against Dominguez's "use or attempted use of unlawful deadly force." *See* TEX. PENAL CODE ANN. § 9.32(a)(2)(A).

Viewing all of the evidence in the light most favorable to the verdict, the jury could have found the essential elements of the offense beyond a reasonable doubt and also could have found against Foster on his justification defenses. *See Braughton*, 569 S.W.3d at 609; *Fountain*, 604 S.W.3d at 583.

19

## IV.     Conclusion

We affirm the trial court's judgment.

Jeff Rambin
Justice

Date Submitted:     July 9, 2025
Date Decided:       September 4, 2025

Do Not Publish

20